_____

| | |
|---|---|
| THOMAS MARTIN, FREDERICK NEAL, ) | |
| and CARL McROBERTS, JR., on behalf of ) | |
| themselves and others similarly situated, ) | |
| ) | |
| Plaintiffs, ) | Civil Action No. |
| ) | |
| v. ) | |
| ) | |
| WESTERN EXPRESS, INC., ) | **JURY DEMANDED** |
| ) | |
| Defendant. ) | |

_____ )

## CLASS ACTION COMPLAINT

### I.    INTRODUCTION

1.    Plaintiffs Thomas Martin, Frederick Neal, and Carl McRoberts, Jr. bring

this action on behalf of themselves and other individuals who have been recruited to

work for Defendant Western Express, Inc. (hereinafter "Western Express") as truck

drivers and have been subjected to Western Express's attempts to force them to perform

labor for its financial benefit as "team drivers."

2.    Plaintiffs allege that certain practices Western Express uses to recruit and

employ "team drivers" are intended to cause persons to believe that, if they did not

perform labor for the company as "team drivers," they would suffer serious harm.

Plaintiffs allege that such conduct by Western Express violates Chapter 77 of Title 18 of

the U.S. Code, 18 U.S.C. §§ 1589, 1590, and 1594 ("forced labor statute").

3.    Plaintiffs allege that certain practices Western Express uses to recruit

"team drivers" also constitute unfair methods of competition and unfair and deceptive

practices under the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. Ann. § 42-110g (a).

4.     Plaintiffs each attended a three-day orientation with Western Express after recruiters informed them that Western Express had company positions available for "solo drivers."

5.      Plaintiffs did not learn until after they completed the orientation and signed onboarding employment paperwork that they were contractually obligated to complete hundreds of hours of "training" before Western Express would let them drive solo for the company.

6.     Western Express's "training" consists of "team driving" with a lead driver and is a ploy the company uses to obtain team drivers.

7.     Team driving is more lucrative than solo driving for motor carriers such as Western Express, but it is difficult for motor carriers to recruit people for team driving because the work conditions are less desirable than solo driving.

8.     Western Express does not disclose during its recruiting process that if drivers do not complete the "training" after being hired, the company will advise them that they are not allowed to work for other motor carriers (because of a non-competition provision); claim that they owe Western Express thousands of dollars; threaten to place them in collections and report their defaulted contract to national credit agencies if they do not pay Western Express thousands of dollars; and actually place them in collections, causing their alleged debt to be reported to national credit agencies.

9.  When Plaintiffs attempted to terminate their employment with Western Express, the company advised them that it would seek to prevent them from obtaining employment with any other motor carrier – indefinitely – unless they returned to Western Express and performed work as a team truck driver or "bought out" their contracts for thousands of dollars.

10. Western Express justifies this practice based on the costs it claims to incur in "training" the drivers.

11. Western Express also withholds payment of drivers' final paychecks under the guise of deducting a "truck abandonment fee," which exceeds the amount that drivers are due to be paid.

12. On behalf of themselves and all other similarly situated individuals, Plaintiffs seek compensatory damages, punitive damages, actual damages, equitable relief, attorneys' fees and costs, and all other relief to which they are entitled under 18 U.S.C. § 1595 and Conn. Gen. Stat. Ann. § 42-110g(a).

13. Plaintiffs also seek unpaid minimum wages, liquidated damages, equitable relief, attorneys' fees and costs, and all other relief to which they are entitled under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*, as a result of Western Express unlawfully withholding final paychecks.

## II.  PARTIES

14. Plaintiff Thomas Martin is an adult resident of Bristol County, Massachusetts.  He attended Western Express's truck driver orientation in Plainfield,

Connecticut in September 2021 and subsequently team-drove for Western Express until September 24, 2021.

15.     Plaintiff Frederick Neal is an adult resident of Montgomery County, Maryland.  He attended Western Express's truck driver orientation in Ashland, Virginia in April 2021 and subsequently team-drove for Western Express until June 23, 2021.  He was an "employee" of Western Express within the meaning of the FLSA.

16.     Plaintiff Carl McRoberts Jr. is an adult resident of Franklin County, Kentucky.  He attended Western Express's truck driver orientation in Nashville, Tennessee in or around April 2020.

17.     Plaintiffs Martin, Neal, and McRoberts bring their claims under 18 U.S.C. § 1589, et seq., on behalf of all similarly situated individuals pursuant to Rule 23(b)(2) and Rule 23(b)(3) of the Federal Rules of Civil Procedure.  The proposed class meets the requirements of Rule 23(b)(2) and Rule 23(b)(3) of the Federal Rules of Civil Procedure for class certification.

18.     Plaintiff Thomas Martin brings the CUTPA claims on behalf of all similarly situated individuals who attended Western Express's orientation in Connecticut, pursuant to Conn. Gen. Stat. § 42-110g (b) and Rule 23(b)(3) of the Federal Rules of Civil Procedure.  The proposed class meets the requirements of Rule 23(b)(3) of the Federal Rules of Civil Procedure for class certification.

19.     Plaintiff Thomas Martin further seeks injunctive relief under CUTPA on behalf of all similarly situated individuals who attended Western Express's orientation in Connecticut and in states other than Connecticut, pursuant to Rule 23(b)(2) of the

Federal Rules of Civil Procedure. The proposed class meets the requirements of Rule 23(b)(2) of the Federal Rules of Civil Procedure for class certification.

20. Plaintiff Frederick Neal brings the FLSA claims on behalf of all similarly situated individuals who may choose to "opt in" to this action pursuant to the FLSA, 29 U.S.C. § 216(b). The claims under the FLSA meet the requirements for collective action certification set forth in 29 U.S.C. § 216(b).

21. Defendant Western Express, Inc. is a Tennessee corporation that is registered with the Secretary of the State of Connecticut as a foreign corporation and operates a terminal in Windham County, Connecticut. Western Express recruits and employs individuals as truck drivers, including Plaintiffs Martin, Neal, and McRoberts. Western Express has revenues in excess of $500,000 per year and has, at all times relevant to this case, employed two or more persons, including Plaintiff Frederick Neal, who handled and worked on materials which had been moved in interstate commerce.

## III. JURISDICTION AND VENUE

22. Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this case arises under the laws of the United States. Specifically, this action arises under Chapter 77 of Title 18 of the U.S. Code, 18 U.S.C. §§ 1589, 1590, and 1594, and the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq*.

23. Plaintiffs request that this Court exercise supplemental jurisdiction over their claims under the laws of Connecticut pursuant to 28 U.S.C. § 1367.

24.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because Defendant is subject to the Court's personal jurisdiction due to its substantial contacts with and conduct of business in the state of Connecticut.

## IV.     FACTS

25.     Plaintiff Thomas Martin was contacted by a recruiter for Western Express in early September 2021 and subsequently spoke to multiple Western Express recruiters, including one who told him that, as a company driver, he would have his own truck and would be able to return home on the weekends.

26.     Western Express then invited Martin to attend orientation in Plainfield, Connecticut via an email sent to Martin on September 14, 2021, a copy of which is attached as Exhibit 1.

27.     Western Express is a self-described "asset-based truckload carrier headquartered in Nashville, TN with terminals and facilities throughout the United States."

28.     One of the terminals that Western Express operates is located in Plainfield, Connecticut on approximately 12.8 acres.

29.     Western Express states on its website that "[a]ll new Western Express drivers are required to attend" orientation, during which time "you will learn about our safety and operational procedures, take a road test and complete all necessary paperwork. You will also meet someone from every department, including Safety, Operations, Fuel Compliance, Driver Payroll and more."

30.     Western Express's orientation lasts two to three days and is conducted at all or most of its terminals, including at its terminals in Plainfield, Connecticut; Richmond, Virginia; Nashville, Tennessee; and Bethlehem, Pennsylvania.

31.     Martin attended Western Express's orientation in Plainfield, Connecticut from September 20, 2021 through September 22, 2021, with a cohort of approximately 10 individuals.

32.     Plaintiff Carl McRoberts Jr. attended Western Express's orientation in Nashville, Tennessee in or around April 2020 after communicating with a Western Express recruiter, who arranged for McRoberts to travel to Nashville from McRoberts' home in Kentucky.

33.     Plaintiff Frederick Neal attended Western Express's orientation in Richmond, Virginia in April 2021 after speaking with a Western Express recruiter, who told him that he would make $0.57 cents per mile as a company driver with Western Express and arranged for Neal's transportation to Richmond.

34.     At Western Express's orientation, drivers spend most of their time watching online videos relating to Western Express's policies, practices, and systems and filling out paperwork required by Western Express.

35.     On the last day of orientation, drivers complete standard new hire paperwork online.

36.     For example, the list of forms Martin was required to sign on his final day of orientation is documented in an email, a copy of which is attached as Exhibit 2.  The list includes a Personal Property Disclaimer, Parking Release of Liability, Employment

Offer Letter, Drug Abuse and Misuse Policy, Voluntary Self Identification, Direct Deposit Form, Payroll Deduction Form, Accident Reporting, Safety Rules, High Value Load Security, Form I-9, and W-4 Federal Tax Withholding.

37.     After about an hour of completing this paperwork, Martin was presented with and required to sign, electronically, a document titled "Driver Bonus and Employment Agreement"; this form is referred to on the list of documents to be signed as an "L4N Agreement."

38.     After completing the online paperwork, Martin was handed a packet that included information about him needing to complete 240 hours of "training" by team-driving with a "trainer"; this was the first time that Martin was made aware that he would need to go through a training period or that he would need to team-drive before he could drive solo.

39.     McRoberts, like Martin, only learned after completing more than a day of orientation that Western Express would require him to team drive with a lead driver.

40.     McRoberts had previously driven with a co-driver and was unwilling to do so again; he messaged his recruiter, Casey, writing: "They said here that they not have any reference checked so I had to go out with someone.  I don't do that.  I played that game."

41.     McRoberts then used his credit card to rent a car so he could drive himself home to Kentucky.

42.     Similar to Martin, Neal attended orientation for approximately three days, and, after having signed all of the standard new-hire paperwork required by Western Express, was hired by Western Express on April 28, 2021.

43.     Only at that point did Neal learn that Western Express was going to require him to team-drive with a lead driver before he could drive solo.

44.     After approximately 30 hours of team driving immediately after orientation, Martin's lead driver decided that Martin did not need additional training and returned to the Plainfield terminal on September 24, 2021, to drop him off.

45.     That day, Martin emailed a Western Express manager to ask about how he could get his own trip, i.e., drive solo.  On Monday, September 27, 2021, Martin spoke with a Western Express team lead about driving solo.  Martin followed up with an email on Tuesday, September 28, 2021, to which the team lead responded and informed him that he would need to finish "training" with a lead driver.  Later that evening, Martin responded, "If I have a different trainer I'll give it another shot."

46.     On Wednesday, September 29, 2021, Martin received an email from a Western Express recruiter named Trevor Napier stating that he was "under an active non compete agreement with Western Express."  This was the first time Martin had heard of a non-compete agreement.  Martin asked for a copy of the agreement.

47.     On October 1, 2021, Napier sent Martin the "Driver Bonus and Employment Agreement" he had signed on September 22, 2021, stating, "Attached you'll find the requested copy of your employment agreement. Upon review if you cho[o]se to return and complete your employment agreement please contact me at 615-

846-8174. If you cho[o]se to exercise your buyout option please contact Kim Carter at 615-846-6976." A copy of the email and the agreement is attached as Exhibit 3.

48. On October 4, 2021, Martin sent an email to his team lead formally resigning from Western Express.

49. After resigning, Martin continued to receive harassing text messages and calls from Napier and others trying to get him to return to Western Express to "complete" his contract.

50. For example, on December 6, 2021, Martin received an email from Western Express's Employment Agreement Manager referencing his contractual obligations and further asking him to: "Please contact recruiting at (888) 219-2093 to discuss returning to work or me at (615) 846-6976 to exercise your right to buyout your employment agreement by December 13, 2021. . . We look forward to your prompt response. I am confident that we will be able to reach a mutually agreeable solution in this matter." A copy of this email is attached as Exhibit 4.

51. Similarly, when Neal attempted to resign on June 23, 2021, his team lead told Neal that he was contractually obligated to drive for Western Express and that if he did not finish out his term, he would need to pay Western Express.

52. Western Express then charged Neal a $923 "truck abandonment" fee, which was deducted from his final two paychecks, zeroing out his earnings for both pay periods.

53. On July 8, 2021, Napier emailed Neal, stating "You are currently under an active non compete agreement with Western Express and we are reaching out to see if

you are ready to return to complete your agreement. . . If you are no longer interested in returning please let me know so I can get you in contact with our contract department to explore various options." A copy of this email is attached as Exhibit 5.

54.     On January 25, 2021, Western Express sent McRoberts the email attached as Exhibit 6, in which Western Express's Employment Agreement Manager writes:

> You have seven days from receipt of this email to respond by email, call me or recruiting. If you haven't responded Western Express Inc., will move forward with review for placement with our collection agency. If your account is sent to collections an additional 25% collections cost maybe added and your defaulted contract will be reported to the national credit agencies.
>
> As required by law, you are hereby notified that a negative credit mark reflecting on your credit record may be submitted to one or more credit reporting agencies if you fail to fulfill the terms of your contract.

55.     On June 1, 2021, Western Express again sent McRoberts an email, attached as Exhibit 7, threatening the following:

> You have seven (7) calendar days from transmission of this communication to respond. If Western Express does not receive a response within seven (7) calendar days, Western will move forward with review for placement with a collection agency. If your account is sent to collections, additional fees may be incurred, including collections costs of up to 25% and interest of up to 18%, as provided in the terms of the Employment Agreement.
>
> As required by law, you are hereby notified that a negative credit mark reflecting on your credit record may be submitted to one or more credit reporting agencies if you fail to fulfill the terms of your Employment Agreement.

56.     On or around January 1, 2022, McRoberts received a letter from a third-party debt collector stating that it was attempting to collect an alleged debt he owed to Western Express Inc. in the amount of $2,301.35.

57.     As of May 3, 2023 McRoberts' credit report showed an open balance of $2,301, and indicated that the original creditor was Western Express.

## V.     FORCED LABOR RULE 23 CLASS ACTION ALLEGATIONS

58.     On information and belief, Western Express has knowingly recruited numerous persons for labor and has obtained and attempted to obtain the labor of Plaintiffs Martin, Neal, and McRoberts and other similarly situated drivers by means of threats of serious harm, by means of the abuse or threatened abuse of law or legal process, and/or by means of a scheme, plan, or pattern intended to cause persons to believe that, if they did not perform labor for the company, they would suffer serious harm.

59.     Western Express's threats of serious harm and abuse or threatened abuse of law or legal process include: threatening to enforce a non-compete that seeks to prevent drivers from working for any other motor carrier, with no geographic or temporal restrictions; requiring drivers to "buy-out" the contracts containing the non-compete to avoid Western Express enforcing the non-compete; threatening to place thousands of dollars in "liquidated damages" with collections agencies if drivers do not "buy-out" the contracts, thereby causing the driver to incur up to 25 percent in collection fees and negative credit marks on their credit reports.

60.     These actions also constitute a scheme, plan, or pattern intended to cause persons to believe that, if they did not perform labor for the company, they would suffer serious harm.

61.     On information and belief, Western Express uses the threat of enforcing the non-compete and/or the threat of collecting thousands of dollars in alleged debt from drivers only because it is and has been a successful strategy for rehiring drivers and/or preventing drivers from leaving their employment.

62.     Plaintiffs Martin, Neal, and McRoberts assert their claims against Defendant Western Express under the federal statute prohibiting forced labor, Chapter 77 of the U.S. Code, 18 U.S.C. § 1589, et seq., on behalf of a class pursuant to Fed. R. Civ. P. 23(b)(3).

63.     Pending any modifications necessitated by discovery, Plaintiffs preliminarily define the following class:

> All individuals who have attended Western Express's company driver orientation within the past ten years and have been threatened with a non-competition agreement and/or advised they needed to pay Western Express for not completing post-orientation training, excluding all individuals whose debt allegedly owed to Western Express is for CDL trucking school.

64.     All potential Rule 23 plaintiffs are similarly situated with respect to the forced labor claim because, *inter alia*, they all:

a.   Attended Western Express's orientation;

b.   Performed labor for Western Express during orientation and/or as team drivers; and

c.   Were subjected to threats of serious harm, namely financial and reputational harm.

65. The members of the class are so numerous that joinder of all of them is impracticable. On information and belief, the number of class members is in the hundreds if not thousands.

66. There are issues of law and fact common to all class members, because Western Express's recruitment, orientation, and labor practices apply to all class members. The common questions of law and fact predominate over any questions affecting individual class members.

67. The claims of the named plaintiffs are typical of the claims of all members of the class, because all members of the class were subject to the same unlawful practices.

68. The named plaintiffs and their counsel will fairly and adequately represent the interests of the class.

69. The claims asserted on behalf of the class predominate over any question of law or fact affecting only individual members of the class. The predominant questions of law or fact are clear, precise, well-defined, and applicable to the named plaintiffs as well as every absent member of the proposed class.

70. A class action is superior in this case for reasons including, but not limited to, the following: the case challenges uniform deceptive practices; many class members may be reluctant to bring claims individually for fear of retaliation; some class members may not have the motivation or resources to bring their claims individually; and it would be an inefficient use of scarce judicial resources to require each individual affected by the practices challenged herein to bring his or her own individual claim.

## VI.  CONNECTICUT UNFAIR TRADE PRACTICES ACT RULE 23(B)(3) CLASS ACTION ALLEGATIONS

71.    On information and belief, Western Express has engaged in similar unfair and deceptive practices as those experienced by Thomas Martin, namely: recruiting for company driver positions that individuals reasonably expect will be at-will positions as solo drivers; then, only after individuals have committed themselves to work for Western Express by attending Western Express's orientation for two to three days and by signing Western Express's new hire paperwork, informing them about the requirement to perform hundreds of hours of team driving as "training."

72.    On information and belief, Western Express has engaged in these unfair and deceptive practices at its Plainfield, Connecticut terminal, as well as at its terminals in other states.

73.    Western Express's actions have caused an ascertainable loss of money or property to drivers by:  (a) causing individuals to forego other job opportunities with less onerous conditions of employment; (b) causing individuals to incur thousands of dollars of debt for Western Express "training," which they would not have incurred as at-will company drivers; and (c) inhibiting individuals from seeking and obtaining work with other motor carriers due to the threat of Western Express attempting to enforce the non-compete agreement.

74.    For example, Thomas Martin is now burdened by a debt of $2,500 to Western Express that he must pay in order to "buy out" his employment contract.

75.    Defendant's actions are in violation of the CUTPA.

76.     Thomas Martin asserts his claim against Defendant Western Express

under the CUTPA on behalf of a class pursuant to Conn. Gen. Stat. § 42-110g (b) and

Fed. R. Civ. P. 23(b)(3).

77.     Pending any modifications necessitated by discovery, Plaintiff

preliminarily defines the following class:

> All individuals who have attended Western Express orientation in
> Connecticut since three years before the filing of the Complaint and
> were subjected to a non-competition agreement and/or advised
> they needed to pay Western Express for not completing post-
> orientation training, excluding all individuals whose debt allegedly
> owed to Western Express is for CDL trucking school.

78.     All potential Rule 23 plaintiffs are similarly situated with respect to the

CUTPA damages claim because they all suffered from the same unlawful practices,

including:

a.  Representations made during recruitment that solo driver jobs are

available at Western Express;

b.  Western Express's  failure to disclose during recruitment and orientation

that individuals would be required to team drive as "training" before they

can drive solo;

c.  Western Express's failure to disclose during recruitment and orientation

that individuals would need to sign an employment contract to drive for

Western Express;

d.  Western Express's failure to disclose during recruitment and orientation

that individuals would be prevented from working for other motor

carriers;

e. Western Express's failure to disclose during recruitment and orientation that individuals would incur thousands of dollars in debt by accepting a position with Western Express; and

f. an ascertainable loss of money or property as a result of these practices.

79. The members of the class are so numerous that joinder of all of them is impracticable. On information and belief, the number of class members is in the hundreds if not thousands.

80. There are issues of law and fact common to all class members, because Western Express's recruitment, orientation, and retention practices apply to all class members. The common questions of law and fact predominate over any questions affecting individual class members.

81. The claims of Plaintiff Thomas Martin are typical of the claims of all members of the class, because all members of the class were subject to the same unlawful practices.

82. Plaintiff Thomas Martin and his counsel will fairly and adequately represent the interests of the class.

83. The claims asserted on behalf of the class predominate over any question of law or fact affecting only individual members of the class. The predominant questions of law or fact are clear, precise, well-defined, and applicable to the named plaintiff as well as every absent member of the proposed class.

84. A class action is superior in this case for several reasons including, but not limited to, that: the case challenges uniform deceptive practices; many class members

may be reluctant to bring claims individually for fear of retaliation; some class members

may not have the motivation or resources to bring their claims individually; and it

would be an inefficient use of scarce judicial resources to require each individual

affected by the practices challenged herein to bring his or her own individual claim.

**VII. CONNECTICUT UNFAIR TRADE PRACTICES ACT RULE 23(b)(2) CLASS ACTION ALLEGATIONS**

85.     Plaintiff Thomas Martin also asserts his claim against Defendant Western

Express under the CUTPA on behalf of a nation-wide class pursuant to Fed. R. Civ. P.

23(b)(2).

86.     Pending any modifications necessitated by discovery, Plaintiff

preliminarily defines the following class:

> All individuals who have attended Western Express orientation in
> any state since three years before the filing of the Complaint and
> were subjected to a non-competition agreement and/or advised
> they needed to pay Western Express for not completing post-
> orientation training, excluding all individuals whose debt allegedly
> owed to Western Express is for CDL trucking school.

87.     All potential Rule 23 plaintiffs are similarly situated with respect to the

CUTPA injunctive relief claim because they all suffered from the same unlawful

practices, including:

    a.   Representations made during recruitment that solo driver jobs were

         available at Western Express;

    b.   Western Express's failure to disclose during recruitment and orientation

         that individuals would be required to team-drive before they can drive

         solo;

c. Western Express's failure to disclose during recruitment and orientation that individuals would need to sign an employment contract to drive for Western Express;

d. Western Express's failure to disclose during recruitment and orientation that individuals would be prevented from working for other motor carriers; and

e. Western Express's failure to disclose during recruitment and orientation that individuals would incur thousands of dollars in debt by accepting a position with Western Express.

88.     The members of the class are so numerous that joinder of all of them is impracticable.  On information and belief, the number of class members is in the hundreds if not thousands.

89.     There are issues of law and fact common to all class members, because Western Express's recruitment, orientation, and retention practices apply to all class members.  The common questions of law and fact predominate over any questions affecting individual class members.

90.     The claims of Plaintiff Thomas Martin is typical of the claims of all members of the class, because all members of the class were subject to the same unlawful practices.

91.     Plaintiff Thomas Martin and his counsel will fairly and adequately represent the interests of the class.

## VIII. FAIR LABOR STANDARDS ACT COLLECTIVE ACTION ALLEGATIONS

92.     Plaintiff Frederick Neal asserts his claim against Defendant Western

Express under the FLSA, pursuant to 29 U.S.C. § 216(b), on behalf of himself and on

behalf of all other similarly situated individuals currently and formerly employed by

Western Express.

93.     Pending any modifications necessitated by discovery, Plaintiff

preliminarily defines the collective for which he seeks certification under section 216(b)

as follows:

> All individuals who were paid less than the minimum wage by Western
> Express during their final pay period(s) as a result of deductions taken by
> Western Express related to their termination from employment.

94.     These claims meet the requirements for collective action certification

under the FLSA.

95.     All potential opt-in plaintiffs are similarly situated with respect to the

FLSA claims because they were all paid less than the minimum wage due to unlawful

deductions taken from their final paycheck(s) by Western Express.

## COUNT I – CHAPTER 77 FORCED LABOR
### (Forced Labor Claim)

96.     Defendant's conduct, as set forth above, violates the federal statute

prohibiting forced labor, Chapter 77 of the U.S. Code.

97.     Defendant has knowingly obtained the labor of persons, including the

named plaintiffs, by means of threats of serious harm, by means of the abuse or

threatened abuse of law or legal process, and/or by means of a scheme, plan, or pattern

intended to cause persons to believe that, if they did not perform labor for the company, they would suffer serious harm in violation of 18 U.S.C. § 1589(a)(2).

98.     Defendant has knowingly recruited persons for labor, including the named plaintiffs, in violation of 18 U.S.C. § 1589(a)(2), thereby violating 18 U.S.C. § 1590(a).

99.     Defendant has attempted to obtain the labor of persons, including the named plaintiffs, by means of threats of serious harm, by means of the abuse or threatened abuse of law or legal process, and/or by means of a scheme, plan, or pattern intended to cause persons to believe that, if they did not perform labor for the company, they would suffer serious harm in violation of 18 U.S.C. § 1594(a).

100.    Defendant has attempted to recruit persons for labor in violation of 18 U.S.C. § 1589(a)(2), including the named plaintiffs, thereby violation 18 U.S.C. § 1594(a).

101.    This claim is brought against Defendant Western Express on behalf of the named plaintiffs and all other similarly situated individuals pursuant to 18 U.S.C. § 1595 and Fed. R. Civ. P. 23.

## COUNT II – CONNECTICUT UNFAIR TRADE PRACTICES PROTECTION ACT
### (Unfair and Deceptive Practices Claim)

102.    Defendant Western Express's conduct, as set forth above, violates the CUTPA.  Through the actions described above, Western Express has violated the provisions of CUTPA, which prohibits persons from engaging in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.  This claim is brought against Defendant Western Express on behalf of the

Plaintiff Thomas Martin, and all other similarly situated individuals pursuant to Conn. Gen. Stat. § 42-110g (b) and Fed. R. Civ. P. 23.

## COUNT III – FAIR LABOR STANDARDS ACT
### (Final Paycheck Claim)

103. Defendant Western Express has engaged in conduct, by taking deductions from drivers final paychecks that result in drivers being compensated at less than the minimum wage for all hours worked, that violates the FLSA, 29 U.S.C. § 201, *et seq*. This claim is brought against Defendant Western Express on behalf of Plaintiff Frederick Neal, and all other similarly situated individuals pursuant to 29 U.S.C. § 216(b).

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter the following relief:

a. Certification of the forced labor claim as a class action under Fed. R. Civ. P. 23(b)(3) and Fed. R. Civ. P. 23(b)(2);

b. An award of damages, including compensatory damages and punitive damages, pursuant to 18 U.S.C. § 1595;

c. Appropriate injunctive and declaratory relief to further the purpose of the forced labor statute;

d. Certification of the CUTPA claim as a class action under Fed. R. Civ. P. 23(b)(3) and Fed. R. Civ. P. 23(b)(2);

e. An award of damages under the CUTPA pursuant to Conn. Gen. Stat. Ann. § 42-110g;

f. A declaratory judgment that Defendant Western Express's actions, as set forth herein, are unlawful under the CUTPA, pursuant to Conn. Gen. Stat. Ann. § 42-110g;

g. Appropriate ancillary relief under the CUTPA;

h. Punitive damages pursuant to Conn. Gen. Stat. § 42-110g;

i. Certification of the proposed opt-in class pursuant to the FLSA, 29 U.S.C. § 201, *et seq.*;

j. Permission for Plaintiff Frederick Neal to notify similarly situated individuals of their right to opt in to this action to pursue a claim under the FLSA, pursuant to 29 U.S.C. § 216(b);

k. An award of damages for all minimum wages that are due to Frederick Neal and all similarly situated individuals under the FLSA;

l. Statutory liquidated damages under the FLSA;

m. A finding that Defendants' violation of the FLSA was willful and that, therefore, the statute of limitations for the FLSA claim is three years;

n. An injunction preventing Defendant from continuing the legal violations described herein;

o. An award of attorneys' fees and costs;

p. Pre- and post-judgment interest; and

q.     Any other relief to which Plaintiffs and similarly situated individuals may be

entitled.

                                       Respectfully submitted,

                                       THOMAS MARTIN, FREDERICK NEAL,
and CARL McROBERTS JR., on behalf of
themselves and all others similarly situated,

                                       By their attorneys,

                                       */s/ Peter Goselin*
Peter Goselin
THE LAW OFFICE OF PETER GOSELIN
P.O. Box 331313
Hartford, CT 06133
(860) 580-9675
Email: pdgoselin@gmail.com


Hillary Schwab
*Application for admission pro hac vice forthcoming*
Rachel Smit
*Application for admission pro hac vice forthcoming*
FAIR WORK, P.C.
192 South Street, Suite 450
Boston, MA 02111
(617) 607-3260
www.fairworklaw.com
Email: hillary@fairworklaw.com,
rachel@fairworklaw.com


Dated: June 14, 2023