# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **THOMAS MARTIN, FREDERICK** | : | |
| **NEAL, and CARL McROBERTS, JR.,** | : | No. 3:23-cv-00775 |
| **on behalf of themselves and others** | : | |
| **similarly situated,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **WESTERN EXPRESS, INC.** | : | |
| | : | |
| **Defendant.** | : | **September 19, 2023** |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO TRANSFER, DISMISS AND/OR STRIKE

Sarah A. Westby
Daniel A. Schwartz
SHIPMAN & GOODWIN LLP
One Constitution Plaza
Hartford, CT 06103
Telephone: (860) 251-5000
Fax: (860) 251-5216
swestby@goodwin.com
dschwartz@goodwin.com

David L. Johnson (admitted *pro hac vice*)
BUTLER SNOW LLP
The Pinnacle at Symphony Place
150 3rd Avenue South, Suite 1600
Nashville, TN  37201
Telephone: (615) 651-6700
Fax: (615) 651-6701
David.johnson@butlersnow.com

*Counsel for Defendant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................... 1

ARGUMENT ........................................................................................................ 5

I.     The Court should transfer Plaintiff Martin's claims to the United States District Court for the Middle District of Tennessee. ........................................... 5

      A.     The clause was reasonably communicated and is mandatory.................... 6

      B.     Martin's claims fall within the scope of the forum-selection clause and are, thus, subject to the clause............................................................................ 7

      C.     The forum-selection clause is not unreasonable or unjust. ...................... 10

II.     The Court should dismiss all of Plaintiffs Neal and McRoberts' claims due to lack of jurisdiction. ................................................................................................. 11

III.     Alternatively, the Court should transfer Plaintiffs Neal and McRoberts' claims to the Middle District of Tennessee. .......................................................... 14

IV.     Plaintiffs' TVPA claim (Count I) should be dismissed for failure to state a claim for which relief may be granted. .......................................................... 14

      A.     Plaintiffs have not alleged facts that could show that Western Express threatened them with "serious harm."...................................................... 16

      B.     Plaintiffs have not alleged that any threat of harm was improper. ........... 20

      C.     Plaintiffs have not alleged any abuse of the legal process....................... 23

V.     Plaintiff Martin's CUTPA claim (Count II) should be dismissed for failure to state a claim for which relief may be granted. .......................................................... 25

      A.     Martin's claim does not pertain to trade or commerce. ........................... 26

      B.     Martin's claim is also barred by the primary line of business doctrine. ... 29

      C.     Martin has not alleged any unfair or deceptive acts. ............................... 32

      D.     Martin has not pled that he has sustained any damages............................ 33

      E.     Martin may not pursue a nationwide class action CUTPA claim............. 35

CONCLUSION..................................................................................................... 36

# TABLE OF AUTHORITIES

**Cases**

*Advanced Copy Techs., Inc. v. Wiegman*, No. CV156013794, 2016 WL 4071863 (Conn. Super.
Ct. 2016) ......................................................................................................................... 27

*America's Collectibles Network, Inc. v. Chase Paymentech Solutions, LLC*, 2008 WL 4546251
(E.D. Tenn. Sept. 24, 2008) ............................................................................................. 7

*Arawana Mills Co. v. United Technologies Corp.*, 795 F. Supp. 1238 (D. Conn. 1992) ............ 29

*Artie's Auto Body, Inc. v. Hartford Fire Ins. Co.*, 287 Conn. 208, 947 A.2d 320 (2008) ........... 33

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................................ 15

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................................... 15

*Beyond Home Care Staffing Serv., LLC*, CV 156058438, 2016 WL 8115595 (Conn. Super. Ct.
Oct. 24, 2016) ........................................................................................................... 27, 30

*Biro v. Matz,* 132 Conn. App. 272, 290, 33 A.3d 742 (2011) ..................................................... 30

*Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 582 U.S. 255 (2017) ..................................... 13

*Butler Am., LLC v. Ciocca*, No. X08FSTCV196043745S, 2020 WL 6781488 (Conn. Super. Ct.
Mar. 12, 2020) ............................................................................................................... 31

*CAP Maintenance Solutions, LLC v. Wallingford Autopark, Inc.*, CV166060392S, 2016 WL
5798834 (Conn. Super. Ct. Sept. 6, 2016) ..................................................................... 28

*Carmen v. Health Carousel, LLC*, 2021 WL 2476882  (S.D. Ohio June 17, 2021) ......... 20, 22, 23

*Carney v. Horion Invs. Ltd.,* 107 F. Supp. 3d 216 (D. Conn. 2015). ........................................... 14

*Carter v. Paschall Truck Lines, Inc.*, 2023 WL 359559 (W.D. Ky. Jan. 23, 2023) ......... 19, 20, 21

*Carter v. Paschall Truck Lines, Inc.*, 324 F. Supp. 3d 900 (W.D. Ky. 2023) .............................. 18

*Columbia Aircraft Sales, Inc. v. Piper Aircraft, Inc.*, No. 3:20-cv-00701 (JAM), 2020 WL
5904939 (D. Conn. Oct. 6, 2020) ............................................................................... 5-10

*Columbia Dental, P.C. v. Dombkowski*, No. HHDCV155038642, 2017 WL 1015438 (Conn.
Super. Ct. Feb. 14, 2017) .............................................................................................. 31

*Compare Nat'l Waste Assoc.*, 2021 WL 1178284 ...................................................................... 6

*Connecticut v. Moody's Corp.*, 664 F. Supp. 2d 196 (D. Conn. 2009) .............................. 25, 34

*Cucuel v. Fayed*, No. CV94315420, 1997 WL 120007 (Conn. Super. Ct. Feb. 28, 1997) .......... 27

*Dinardo Seaside Tower, Ltd. v. Sikorsky Aircraft Corp.,* 153 Conn. App. 10, 23-26, 100 A.3d
413 (2014) ..................................................................................................................... 30

*Edwards v. McMillen Cap., LLC*, 574 F. Supp. 3d 52 (D. Conn. 2021) ................................ 25, 32

*Elmy v. Western Express, Inc.*, No. 3:17-cv-01199, 2020 WL 1820100 (M.D. Tenn. Apr. 10,
2020) ........................................................................................................................ 18, 20

*Estavilla v. Goodman Group, LLC*, 2022 WL 539192 (D. Mont. Feb. 23, 2022) ............ 17, 21, 24

*Fraiser v. Stanley Black & Decker, Inc.,* 109 F. Supp. 3d 498 (D. Conn. 2015) ......................... 35

*Hasler Aviation, LLC v. Aircenter, Inc.*, 2007 WL 2463283 (E.D. Tenn. Aug. 27, 2007) ............. 8

*Haven Skate Park, LLC v. G.J. Zurolo Real Est., LLC,* No. NNHCV13603537S, 2013 WL
6989496 (Conn. Super. Ct. Dec. 18, 2013) ................................................................... 26

*In re Newman*, 588 B.R. 281 (Bankr. D. Conn. 2018) ................................................................. 25

*In Re Trilegiant Corp., Inc.,* 11 F. Supp. 3d 82 (D. Conn. 2014) ................................................ 35

*Indigo Ag, Inc. v. Fearless Grain Mktg., LLC*, No. 2:21-cv-02052, 2021 WL 6752236 (W.D.
Tenn. Oct. 20, 2021) ........................................................................................................ 7

*Jablonksi v. Sheldon Precision Co.*, No. CV980145784, 2000 WL 486930 (Conn. Super. Ct. Apr.
10, 2000) ........................................................................................................................ 28

*Johnson v. UBS AG*, 791 F. App'x 240 (2d Cir. 2019) ................................................................ 13

*Kintner v. Nidec-Torin Corp.*, 662 F. Supp. 112 (D. Conn. 1987) ............................................. 28

*Lamar, Archer & Cofrin, LLP*, 138 S. Ct. 1752 (2018).............................................................. 8

*Learning Care Group, Inc. v. Armetta*, No. 3:13-cv-01540 (VLB), 2014 WL 12651264 (D. Conn. Sept. 30, 2014) ...................................................................................................... 27

*Marom v. Pierot*, No. 18-cv-12094, 2020 WL 1862974 (S.D.N.Y. Jan. 16, 2020).................... 14

*Martinez v. Bloomberg LP*, 740 F.3d 211 (2d Cir. 2014)..................................................... 5, 10

*Matysiak v. Spectrum Serv. Co.*, No. 3:10-cv-01841, 2014 WL 545412 (D. Conn. Feb. 10, 2014) ................................................................................................................................... 26

*McCann Real Equities Series XXII, LLC v. David McDermott Chevrolet, Inc.*, 93 Conn. App. 486, 890 A.2d 140 (2006) .............................................................................................. 29

*Metro Enter. Corp. v. United Techs. Int'l Corp.*, No. 3:03-cv-1685, 2004 WL 1497545 (D. Conn. June 28, 2004)...................................................................................................... 35

*Muchira v. Al-Rawaf*, 850 F.3d 605 (4th Cir. 2017) ............................................................... 17

*Muniz v. Kravis*, 59 Conn. App. 704, 711, 757 A.2d 1207 (2000) ........................................... 27

*National Union Fire Ins. Co. of Pittsburgh v. UPS Supply Chain Sols., Inc.*, 74 F.4th 66, 71 (2d Cir. 2023) ....................................................................................................................... 1

*National Waste Assocs., LLC v. Ghai Mgmt. Servs., Inc.*, No. 3:20-cv-485 (VLB), 2021 WL 1178284 (D. Conn. Mar. 29, 2021)........................................................................ 5, 10, 11

*Panwar v. Access Therapies, Inc.*, 2015 WL 1396599 (S.D. Ind. Mar. 25, 2015) ............... 22, 24

*Parimal v. Manitex Int'l, Inc.*, No. 3:19-cv-10910, 2021 WL 114691 (D. Conn. Mar. 25, 2021) ................................................................................................................................... 28

*Plimpton v. Bank of Jackson Hole*, No. 3:20-cv-00323 (VAB), 2021 WL 765243 (D. Conn. Feb. 26, 2021) ........................................................................................................... 11, 12, 13

*Quimby v. Kimberly Clark Corp.*, 28 Conn. App. 660, 613 A.3d 838 (1992)........................... 27

*Roby v. Corp. of Lloyd's*, 996 F.2d 1353 (2d Cir. 1993) ........................................................... 6

*Ruschmeyer v. Lydall, Inc.*, No. CV085002515S, 2009 WL 659359 (Conn. Super. Ct. Feb. 19, 2009) ............................................................................................................................... 30

*S.M.S. Textile Mills, Inc. v. Brown, Jacobson, Tillinghast, Lahan & King, P.C.*, 32 Conn. App. 786, 631 A.2d 340 (1993).............................................................................................. 26

*Samelko v. Kingstone Ins. Co.*, 329 Conn. 249 (2018) ........................................................... 11

*Sechler-Hoar v. Trust U/W of Gladys G. Hoart*, No. 3:17-cv-01968 (KAD), 2020 WL 292314 (D. Conn. Jan. 21, 2020)................................................................................................. 31

*Shah v. Cover-It, Inc.*, No. CV990068182, 2000 WL 486945 (Conn. Super. Ct. Apr. 10, 2000) 27

*Societe Des Hotels Meridien v. LaSalle Hotel Operating P'ship, L.P.*, 380 F.3d 126 (2d Cir. 2004) ............................................................................................................................... 15

*Sovereign Bank v Licata,* 116 Conn. App. 483, 494, 977 A.2d 229 (2009) ............................... 30

*SPV Osus Ltd. v. UBS AG*, 882 F.3d 333 (2d Cir. 2018)........................................................ 13

*Stavridis v. Nat'l Spine and Pain Centers, LLC,* No. DBDCV19603492S, 2020 WL 3790729 (Conn. Super. Ct. June 15, 2020)..................................................................................... 28

*Success Sys., Inc. v. CRS, Inc.*, No. 3:21-cv-1391 (SVN), 2023 WL 2742344 (D. Conn. Mar. 31, 2023) ............................................................................................................................. 5, 7

*Suri v. Wolters Kluwer ELM Solutions, Inc.*, No. 3:20-cv-1694 (OAW), 2022 WL 526497 (D. Conn. Feb. 22, 2022)................................................................................................... 11, 12

*United Components, Inc. v. Wdowiak*, 239 Conn. 259 (1996).............................................. 26, 28

*United States v. Callahan*, 801 F.3d 606 (6th Cir. 2015) ...................................................... 17

*United States v. Dann*, 652 F.3d 1160 (9th Cir. 2011) ........................................................... 16

*Wilson v. DirectBuy, Inc.*, 821 F. Supp. 2d 510 (D. Conn. 2011). ................................................ 12

*Wireless Properties, LLC v. Crown Castle Int'l Corp.*, 2011 WL 3420734 (E.D. Tenn. Aug. 4, 2011) ..................................................................................................................... 8, 10

*Yu v. Pitney Bowes, Inc.*, No. FSTCV196039771S, 2019 WL 4060118 (Conn. Super. Ct. 2019)26

**Statutes**

18 U.S.C. § 1589.................................................................................................... passim

28 U.S.C. § 1404(a) ...................................................................................................... 5

29 U.S.C. § 201.............................................................................................................. 4

Conn. Gen. Stat. § 42-110.................................................................................. 26, 27, 34

Conn. Gen. Stat. Ann. § 33-929(e) and (f).................................................................... 12

Conn. Gen. Stat. Ann. § 42-110a .......................................................................... 26, 29

Conn. Gen. Stat. Ann. § 42-110b(a) ............................................................................ 31

**INTRODUCTION**

Plaintiff Thomas Martin improperly brought suit in this Court notwithstanding the fact that he agreed to pursue any claims against Defendant Western Express, Inc. ("Western Express") in Tennessee. Further, Plaintiffs Frederick Neal and Carl McRoberts, Jr. are improperly included as plaintiffs even though they are out-of-state residents, their claims have no connection to Connecticut, and Western Express is domiciled in Tennessee. Consistent with Martin's employment agreement, the Court should transfer his claims to the United States District Court for the Middle District of Tennessee, and it should dismiss Neal and McRoberts' claims for lack of personal jurisdiction. Alternatively, the Court should dismiss Plaintiffs' forced labor and consumer protection claims set forth in Counts I and II because they have not stated a claim for which relief may be granted.

**BACKGROUND[1]**

Western Express is a nationwide asset-based truckload carrier headquartered in Nashville, Tennessee. Doc. 1, ¶ 27. Plaintiffs are former Western Express truck drivers who have expressed a variety of grievances about the company's employment practices. The gravamen of each Plaintiff's claims is that Western Express supposedly pressured them to submit to certain contractual obligations after attending an orientation program.

- **Plaintiff Thomas Martin**

A resident of Massachusetts, Martin attended a Western Express orientation program in Plainfield, Connecticut in September 2021. Doc. 1, ¶ 14. According to Martin, a Western Express recruiter invited him to attend the orientation and told him "he would have his own truck and

---

[1] For purposes of Western Express's motion, the Court should construe Plaintiffs' factual allegations in the light most favorable to them and resolve all doubts in their favor. *See, e.g., National Union Fire Ins. Co. of Pittsburgh v. UPS Supply Chain Sols., Inc.,* 74 F.4th 66, 71 (2d Cir. 2023).

would be able to return home on the weekends." *Id.*, ¶¶ 25-26.  He claims that "[a]t Western Express's orientation, drivers spend most of their time watching online videos relating to Western Express's policies, practices, and systems and filling out paperwork required by Western Express." *Id.*, ¶ 34.  On the last day of the "two to three days" of orientation, Martin alleges that he was "required" to "complete standard new hire paperwork online."  *Id*, ¶¶ 30, 35-36.

"After about an hour of completing this paperwork, Martin was presented with and required to sign, electronically, a document titled 'Driver Bonus and Employment Agreement'" (hereinafter "the Employment Agreement").  *Id.*, ¶ 37.  A copy of Martin's Employment Agreement is filed as Exhibit 3 to the Complaint.  *See* Doc. 1-3.

According to the Complaint, "[a]fter completing the online paperwork, Martin was handed a packet that included information about him needing to complete 240 hours of 'training' by team-driving with a 'trainer'; this was the first time that Martin was made aware that he would need to go through a training period or that he would need to team-drive before he could drive solo."  Doc. 1, ¶ 38.  The Employment Agreement, however, explicitly stated that Martin "agrees to participate in and successfully complete the Training Program," and that "[t]he Training Program duration may be up to 240 hours, based on Driver's demonstrated proficiency and performance."  Doc. 1-3, §§ 1.C, 2.A.

To protect its investment in this Training Program,[2] Western Express requires drivers, in the event of resignation, to pay back the liquidated sum of $2,500, "which amount reasonably represents the value of the Training Program."  Employment Agreement, Doc. 1-3, § 5.  In addition, drivers may not "provide truck driving services to any motor carrier competitor" for a specified period of time unless they tender the $2,500 payment.  *Id.* § 6.

---

[2] Because safety is of paramount performance to Western Express, the company invests significant resources into ensuring that its drivers are properly trained.

Martin alleges that, "[a]fter approximately 30 hours of team driving immediately after orientation, Martin's lead driver decided that Martin did not need additional training[.]" Doc. 1, ¶ 44. Thereafter, Martin expressed interest in driving solo but was told he would need to complete training. *Id.*, ¶ 45. Martin responded: "If I have a different trainer I'll give it another shot." *Id.*

On September 29, 2021, a Western Express employee advised Martin that he was "under an active non compete agreement with Western Express." *Id.*, ¶ 46. Although Martin claims "[t]his was the first time Martin had heard of a non-compete agreement," *id.*, the non-compete restriction is set forth in Section 6 of his Employment Agreement that he previously signed. Doc. 1-3.

Martin formally resigned from Western Express on October 4, 2021. Doc. 1, ¶ 48. He alleges that, thereafter, he received "harassing" inquiries from Western Express about whether he wanted to return to Western Express and whether he intended to exercise his option to buy out his non-compete obligation. *Id.*, ¶¶ 47-50. Martin, however, does not allege that Western Express ever took any action against him or that it has reached out to him since December 13, 2021—more than 1½ years ago. *Id.*, ¶ 50.

- **Plaintiff Frederick Neal**

Plaintiff Neal is a Maryland resident who attended a Western Express orientation in Virginia. Doc. 1, ¶ 15. Western Express arranged for his transportation to the orientation in April 2021, and he was hired on April 28, 2021. *Id.*, ¶¶ 33, 42. "Only at that point did Neal learn that Western Express was going to require him to team-drive with a lead driver before he could drive solo." *Id.*, ¶ 43.

According to the Complaint, "when Neal attempted to resign on June 23, 2021, his team lead told Neal that he was contractually obligated to drive for Western Express and that if he did

not finish out his term, he would need to pay Western Express." *Id.*, ¶ 51. The company also "charged Neal a $923 'truck abandonment' fee, which was deducted from his final two paychecks, zeroing out his earnings for both pay periods." *Id.*, ¶ 52. Neal does not allege that he has heard from Western Express since July 8, 2021—more than two years ago. *See id.*, ¶ 53.

- **Plaintiff Carl McRoberts**

Western Express arranged for Plaintiff McRoberts, a resident of Kentucky, to attend an orientation in Nashville in April 2020. Doc. 1, ¶¶ 16, 32. McRoberts alleges that he "only learned after completing more than a day of orientation that Western Express would require him to team drive with a lead driver." *Id.*, ¶ 39. Unwilling to do this, "McRoberts then used his credit card to rent a car so he could drive himself home to Kentucky." *Id.*, ¶¶ 40-41. Beginning in January 2021, McRoberts began receiving communications from Western Express and a debt collector attempting to recover an unspecified debt slightly in excess of $2000. *Id.*, ¶¶ 54-57.

- **Procedural Status**

Plaintiffs filed a Class Action Complaint on June 14, 2023, alleging three causes of action. Doc. 1. In Count I, all three Plaintiffs, on behalf of themselves and others similarly situated, allege that Western Express subjected them to forced labor in violation of the Trafficking Victims Protection Act of 2000, 18 U.S.C. § 1589, *et seq.* ("TVPA"). In Count II, Martin, on behalf of himself and others similarly situated, alleges that Western Express engaged in conduct in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a, *et seq.* ("CUTPA"). In Count III, Neal, on behalf of himself and others similarly situated, alleges that Western Express took "deductions from drivers' final paychecks that result in drivers being compensated at less than the minimum wage," in violation of Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.* ("FLSA"). Doc. 1, ¶ 103.

**ARGUMENT**

I.      **The Court should transfer Plaintiff Martin's claims to the United States District Court for the Middle District of Tennessee.**

In his Employment Agreement, Martin agreed that "any claim, litigation or dispute arising from or related to this Agreement shall be litigated exclusively in the appropriate federal or state court located in Davidson County, Tennessee" and that the agreement is governed by Tennessee law.  Doc. 1-3, § 14.  As Davidson County is located within the Middle District of Tennessee, the Court should transfer Martin's claims to the United States District Court for the Middle District of Tennessee consistent with the parties' intent.

"[G]enerally 'the appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through the doctrine of *forum non conveniens*, rather than Rule 12(b).'"  *Martinez v. Bloomberg LP*, 740 F.3d 211, 216 (2d Cir. 2014) (quoting *Atlantic Marine Constr. Co. v. U.S. Dist. Ct. for the W. Dist. of Tex.*, 571 U.S. 49, 60 (2013)).  Under 28 U.S.C. § 1404(a), "for the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."  "Because the enforcement of a valid forum-selection clause 'bargained for by the parties, protects their legitimate expectations and furthers vital interests of the justice system,' and because the 'overarching consideration under § 1404(a) is whether a transfer would promote 'the interest of justice,' such a clause should be given controlling weight 'in all but the most exceptional cases.'"  *Columbia Aircraft Sales, Inc. v. Piper Aircraft, Inc.*, No. 3:20-cv-00701 (JAM), 2020 WL 5904939, at *2 (D. Conn. Oct. 6, 2020) (citing *Atlantic Marine,* 571 U.S. at 63); *see also Success Sys., Inc. v. CRS, Inc.*, No. 3:21-cv-1391 (SVN), 2023 WL 2742344, at *6 (D. Conn. Mar. 31, 2023) (similar); *National Waste Assocs., LLC v. Ghai Mgmt. Servs., Inc.*, No. 3:20-cv-485 (VLB), 2021 WL 1178284, at *3 (D. Conn. Mar. 29, 2021)

5

("[C]onsistent with the longstanding principle of freedom of contract, 'contracts entered into freely generally should be enforced because the financial effect of forum selection and choice of law clauses likely will be reflected in the value of the contract as a whole.'" (quoting *Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1363 (2d Cir. 1993)).

In *Columbia Aircraft*, Judge Meyer discussed the framework for considering a forum-selection provision:

> For cases involving a section 1404 motion to transfer due to a valid forum-selection clause, the Supreme Court has instructed that courts should alter the usual analysis for a section 1404 motion in three ways. *Id.* at 63. First, courts should afford no weight at all to the plaintiff's initial choice of forum if it differs from the agreed-upon forum. Instead, the plaintiff bears the burden of establishing why the case should *not* be transferred to the agreed-upon forum. *Id.* at 63-64. Second, courts should not consider arguments about the parties' private interests and convenience because, in deference to the parties' agreement, a court "must deem the private-interest factors to weigh entirely in favor of the preselected forum." *Id.* at 64. Third, "when a party bound by a forum-selection clause flouts its contractual obligation and files suit in a different forum, a § 1404(a) transfer of venue will not carry with it the original venue's choice-of-law rules—a factor that in some circumstances may affect public-interest considerations." *Ibid.*

> To determine whether a forum-selection clause is enforceable, a court must resolve the following three issues: "(1) whether the clause was reasonably communicated to the party resisting enforcement; (2) whether the clause is mandatory or permissive ...; and (3) whether the claims and parties involved in the suit are subject to the forum-selection clause." *Martinez v. Bloomberg LP*, 740 F.3d 211, 217 (2d Cir. 2014) (quoting *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 383 (2d Cir. 2007)). If the forum-selection clause meets all three requirements, it is presumptively enforceable. *Ibid.* This presumption can only be overcome by "making a sufficiently strong showing that enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching." *Ibid.*

2020 WL 5904939, at *2.

### A.    *The clause was reasonably communicated and is mandatory.*

The forum-selection provision was reasonably communicated to Martin, as it is clearly set forth in Section 14 of his Employment Agreement.  *See* Doc. 1-3.  *Compare Nat'l Waste Assoc.*, 2021 WL 1178284, at *4 (rejecting argument that provision was not reasonably communicated on

the basis that signature pages were different). The second element is also satisfied because the terms in the provision are mandatory by prescribing that all claims "*shall* be litigated *exclusively* in*" Tennessee. Doc. 1-3, § 14 (emphasis added).

**B.** ***Martin's claims fall within the scope of the forum-selection clause and are, thus, subject to the clause.***

The Court must apply Tennessee law to determine whether the third element is satisfied. *See Success Sys.,* 2023 WL 2742344, at *7 ("Where a contract contains both a forum selection clause and a choice-of-law provision, 'questions of enforceability are resolved under federal law, while interpretive questions—questions about the meaning and scope of a forum selection clause—are resolved under the substantive law designated in an otherwise valid contractual choice-of-law clause.'") (citing *Martinez,* 740 F.3d at 224); *Columbia Aircraft,* 2020 WL 5904939, at *3 ("To evaluate the scope of the forum-selection clause, [the Court] must apply the law chosen by the parties.").

The language in the Employment Agreement's forum-selection provision specifying that any claim "related to this Agreement" must be litigated in Tennessee, Doc. 1-3, § 14, has broad connotations. *See, e.g., America's Collectibles Network, Inc. v. Chase Paymentech Solutions, LLC,* 2008 WL 4546251, at *7 (E.D. Tenn. Sept. 24, 2008) ("The forum-selection clause employs the broad terms of 'relating to or arising from this Agreement.'"). As noted in *Indigo Ag, Inc. v. Fearless Grain Mktg., LLC,* No. 2:21-cv-02052, 2021 WL 6752236, at *10 (W.D. Tenn. Oct. 20, 2021):

> The phrase "relating to" means "to stand in some relation to; to have bearing or concern; to pertain; refer; to bring into association with or connection with." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (quoting Black's Law Dictionary 1158 (5th ed. 1979)); *see also Lacy v. Vanderbilt Univ. Med. Ctr.*, No. M2016-02014-COA-R3-CV, 2017 WL 6273316, at *6 (Tenn. Ct. App. May 4, 2017) ("In its natural and ordinary usage, the phrase 'related to' simply means connected to in some way."). Similarly, Black's Law Dictionary defines the term

7

"related" as "[c]onnected in some way; having relationship to or with something else." *See Related*, Black's Law Dictionary (11th ed. 2019).

When interpretating statutory language using the phrase "relating to," courts typically interpret the phrase "***expansively***." *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1760 (2018).

(Emphasis added); *compare Columbia Aircraft*, 2020 WL 5904939, at *3 (noting that, under Florida law, "[f]orum-selection clauses that are limited to disputes 'arising out of' the parties' contract are considered to be narrow in scope, while those using language such as 'arising out of or relating to' are considered to be broad in scope").

As observed in *Hasler Aviation, LLC v. Aircenter, Inc.*, 2007 WL 2463283, at *5 (E.D. Tenn. Aug. 27, 2007), "[m]any other courts, including the Sixth Circuit, agree and interpret forum selection clauses with 'related to' language as covering tort or consumer protection claims 'related to' the contract's purpose." *See also* cases cited therein; *Lamar, Archer & Cofrin, LLP*, 138 S. Ct. 1752, 1760 (2018) ("[W]hen asked to interpret statutory language including the phrase 'related to,' . . . this Court has typically read the relevant text expansively"); *Wireless Properties, LLC v. Crown Castle Int'l Corp.*, 2011 WL 3420734, at *6 (E.D. Tenn. Aug. 4, 2011) (finding that similarly-worded forum selection clause was "very broadly written, such that it would encompass the tort claims Plaintiff asserts here").

Martin's allegations fall squarely within the parameters of the forum-selection provision in his Employment Agreement. Indeed, he attached the Employment Agreement as an exhibit and alleges that the "threats" and "harassment" he received pertain to his purported obligations under the agreement. *See* Doc. 1, ¶¶ 46-50, 59; *Columbia Aircraft*, 2020 WL 5904939, at *4 (noting that the plaintiff "extensively cites" the parties' agreement containing a forum-selection provision in its complaint).

Plaintiffs' descriptions of their proposed classes also demonstrate that Martin's claims relate to the Employment Agreement. His proposed class with respect to his forced labor claim encompasses the following:

> All individuals who have attended Western Express's company driver orientation within the past ten years and have been threatened with a non-competition agreement and/or advised they needed to pay Western Express for not completing post-orientation training, excluding all individuals whose debt allegedly owed to Western Express is for CDL trucking school.

Doc. 1, ¶ 63. Plainly, "threatened with a non-competition agreement," *id.*, relates to Section 6 of the Employment Agreement. Further, allegations concerning drivers who were "advised they needed to pay Western Express for post-orientation training," *id.*, relates to Section 5 of the Employment Agreement. To adjudicate those claims, a court would need to review and interpret the Employment Agreement.

Similarly, Plaintiffs' proposed classes with respect to their CUTPA claims encompass the following:

> All individuals who have attended Western Express orientation in Connecticut since three years before the filing of the Complaint and were subjected to a non-competition agreement and/or advised they needed to pay Western Express for not completing postorientation training, excluding all individuals whose debt allegedly owed to Western Express is for CDL trucking school. Doc. 1, ¶ 77.

> All individuals who have attended Western Express orientation in any state since three years before the filing of the Complaint and were subjected to a non-competition agreement and/or advised they needed to pay Western Express for not completing postorientation training, excluding all individuals whose debt allegedly owed to Western Express is for CDL trucking school. *Id.*, ¶ 86.

Again, allegations concerning non-competition restrictions and repayment for post-orientation training all arise directly from Sections 5 and 6 of the Employment Agreement.

Given this nexus between Martin's claims and his Employment Agreement, his claims fall squarely within the purview of the forum-selection provision. *See Wireless Properties*, 2011 WL

3420734, at *7 (forum selection clause applies because "the tort claims asserted against Defendants are so closely intertwined with the Agreement"); *Columbia Aircraft*, 2020 WL 5904939, at *4 ("But the resolution of the CFA and CUTPA claims here necessarily requires reference to or construction of the Dealer Agreement itself.").

### C.     *The forum-selection clause is not unreasonable or unjust.*

Finally, Martin cannot meet his burden of demonstrating that the forum-selection clause should not be enforced on the basis that it is unreasonable or unjust. A court should only decline to enforce a forum-selection provision if any of the following exceptions apply:

> (1) its incorporation was the result of fraud or overreaching; (2) the law to be applied in the selected forum is fundamentally unfair; (3) enforcement contravenes a strong public policy of the forum in which suit is brought; or (4) trial in the selected forum will be so difficult and inconvenient that the plaintiff effectively will be deprived of his day in court.

*Martinez,* 740 F.3d at 228 (cleaned up). "These exceptions are 'interpreted narrowly.'" *Columbia Aircraft*, 2020 WL 59049396, at *5 (citing *S.K.I. Beer Corp. v. Baltika Brewery*, 612 F.3d 705, 711 (2d Cir. 2010)).

Martin may not invoke any of these exceptions. He does not and cannot allege that the forum-selection provision was entered into fraudulently or through foul-play. Nor can he show that Tennessee law is fundamentally unfair or that enforcement of the forum-selection provision would contravene any strong Connecticut public policy. Nor can he show that litigating in Tennessee would be so difficult as to effectively deprive him of his day in court. *See Nat'l Waste,* 2021 WL 1178284, at *5 (noting that there would be no reason for the party to appear in court until trial).

In sum, there is nothing about Martin's claims that makes this an "exceptional case[]." *Atlantic Marine,* 571 U.S. at 63. Litigating in Tennessee was "a fact anticipated, negotiated, and

resolved by the parties in the forum selection provision of the Agreement." *Nat'l Waste*, 2021 WL 1178284, at *5. The Court should enforce the parties' contract and transfer Martin's claims to the Middle District of Tennessee.

## II. The Court should dismiss all of Plaintiffs Neal and McRoberts' claims due to lack of jurisdiction.

Plaintiffs Neal and McRoberts' claims lack any connection to the State of Connecticut. Neal alleges to be a resident of Maryland who attended Western Express's orientation in Virginia. Compl., ¶ 15. McRoberts alleges to be a resident of Kentucky who attended Western Express's orientation in Tennessee. *Id.*, ¶ 16. Neither alleges that he has ever set foot in the State of Connecticut nor that any alleged violative acts or resulting injuries occurred here.

This Court has explained the standard for reviewing a motion brought under Rule 12(b)(2):

> On a motion to dismiss for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2), the "***plaintiff bears the burden*** of showing that the court has jurisdiction over the defendant." *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003). District courts are afforded "considerable procedural leeway" in the method used to resolve the issue of jurisdiction. *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981). Where a court relies on pleadings and affidavits, "the plaintiff need only make a prima facie showing that the court possesses personal jurisdiction over the defendant." *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001). "[A]ll allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor notwithstanding a controverting presentation by the moving party." *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 80 (2d Cir. 1993).

*Suri v. Wolters Kluwer ELM Solutions, Inc.*, No. 3:20-cv-1694 (OAW), 2022 WL 526497, at *2 (D. Conn. Feb. 22, 2022); *see also Plimpton v. Bank of Jackson Hole*, No. 3:20-cv-00323 (VAB), 2021 WL 765243, at *15 (D. Conn. Feb. 26, 2021) ("[I]f the defendant challenging the court's personal jurisdiction is a foreign corporation ... it is the plaintiff's burden to prove the court's jurisdiction.") (quoting *Samelko v. Kingstone Ins. Co.*, 329 Conn. 249, 256 (2018)).

The Court should conduct the following two-step inquiry for determining whether it has personal jurisdiction:

> "Personal jurisdiction of a federal court over a non-resident defendant is governed by the law of the state in which the court sits—subject, of course, to certain constitutional limitations of due process." *Robinson v. Overseas Mil. Sales Corp.*, 21 F.3d 502, 510 (2d Cir. 1994); *see also* Fed. R. Civ. P. 4(k)(1). Thus, courts must engage in a two-step inquiry. *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010). First, the court determines whether the forum state's long-arm statute confers jurisdiction over the defendant. *Id.* Second, if jurisdiction is permissible under the state's statute, the court must determine whether the exercise of jurisdiction comports with the Due Process Clause of the Constitution. *Id.*

*Suri,* 2022 WL 526497, at *2.

Under Connecticut's long-arm statute governing foreign corporations—Conn. Gen. Stat. Ann. § 33-929(e) and (f)—an out-of-state plaintiff may only sue an out-of-state corporation in Connecticut if the suit arises out of the corporation's failure to register business in this state. "Connecticut's long-arm statute for foreign corporations, '***does not confer jurisdiction over actions committed by a nonresident party against another nonresident***.'" *Plimpton*, 2021 WL 765243, at *20 (citation omitted; emphasis added). Nor may a non-resident sue a foreign corporation on behalf of others as part of a proposed class. *See, e.g.*, *Wilson v. DirectBuy, Inc.*, 821 F. Supp. 2d 510, 520–21 (D. Conn. 2011).

Because neither Neal nor McRoberts alleges to be a Connecticut resident and their claims do not arise out of any alleged failure on the part of Western Express to transact business within this state,[3] this Court lacks jurisdiction to consider their claims and they should be dismissed.

¶       Even if Connecticut's long-arm statute afforded these Plaintiffs a basis to bring suit, a Connecticut court's exercise of jurisdiction over their claims against Western Express would not

---

[3] In fact, Plaintiffs allege that Western Express "is registered with the Secretary of State of Connecticut as a foreign corporation." Doc 1, ¶ 21.

pass constitutional scrutiny. To determine whether the exercise of personal jurisdiction comports with due process standards, the Court must determine "whether a defendant has sufficient minimum contacts with the forum to justify the court's exercise of personal jurisdiction over the defendant and whether the assertion of personal jurisdiction over the defendant comports with traditional notions of fair play and substantial justice under the circumstances of the particular case." *Johnson v. UBS AG*, 791 F. App'x 240, 242 (2d Cir. 2019). As explained in *Plimpton, supra*:

> "With respect to minimum contacts ... a distinction is made between 'specific' jurisdiction and 'general' jurisdiction." *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010). "Specific jurisdiction exists when 'a State exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum.'" *Id.* (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 & n.8 (1984)). "A court's general jurisdiction, on the other hand, is based on the defendant's general business contacts with the forum state and permits a court to exercise its power in a case where the subject matter of the suit is unrelated to those contacts." *Id.*

2021 WL 765243, at *16.

A corporation is only subject to general jurisdiction in the place where it is domiciled—"one in which the corporation is fairly regarded as home." *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 582 U.S. 255, 262 (2017). As alleged in the Complaint, "Western Express, Inc. is a Tennessee corporation that is registered with the Secretary of State of Connecticut as a foreign corporation and operates a terminal in Windham County, Connecticut." Doc. 1, ¶ 21. This is insufficient to subject Western Express to general jurisdiction in Connecticut. *See, e.g., SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 343 (2d Cir. 2018) ("Aside from the truly exceptional case, a corporation is at home and subject to general jurisdiction only in its place of incorporation or principal place of business.").

Further, Western Express is not subject to specific jurisdiction with respect to Neal and McRoberts' claims because their claims do not arise out of or relate to Western Express's contacts with Connecticut. Indeed, these Plaintiffs do not allege *any* contacts with Connecticut.

For these reasons, the Court should dismiss Neal and McRoberts' claims in their entirety. Because Neal is the only Plaintiff pursuing an FLSA claim, *see* Doc. 1, ¶¶ 20, 103, Count III should also be dismissed in its entirety.

## III. Alternatively, the Court should transfer Plaintiffs Neal and McRoberts' claims to the Middle District of Tennessee.

In the event that the Court were to determine that it could exercise jurisdiction over Neal and McRoberts' claims, Western Express requests in the alternative that the Court transfer their claims to the Middle District of Tennessee. As with Martin, these Plaintiffs also signed employment agreements specifying that "any claim, litigation or dispute arising from or related to this Agreement shall be litigated exclusively in the appropriate federal or state court located in Davidson County, Tennessee." Ex. 1, § 14; Ex. 2, § 16.[4] Thus, for the same reasons that the Court should transfer Martin's claims, the Court should also transfer these Plaintiffs' claims.

## IV. Plaintiffs' TVPA claim (Count I) should be dismissed for failure to state a claim for which relief may be granted.[5]

Counts I and II of the Complaint should otherwise be dismissed for failure to state a claim for which relief may be granted under Rule 12(b)(6). In reviewing a motion to dismiss under Rule 12(b)(6), the court must "accept all of plaintiff's factual allegations in the complaint as true and

---

[4] These agreements may be considered for purposes of Western Express's motion to transfer. *Carney v. Horion Invs. Ltd.,* 107 F. Supp. 3d 216, 222 (D. Conn. 2015).

[5] This Rule 12(b)(6) challenge should be resolved by the Middle District of Tennessee unless this Court denies Western Express's request for transfer. *See Marom v. Pierot,* No. 18-cv-12094, 2020 WL 1862974, at *2 (S.D.N.Y. Jan. 16, 2020), *report & recommendation adopted,* 2020 WL 1444938 (S.D.N.Y. Mar. 25, 2020) ("Where a motion to transfer venue is filed concomitantly with a dispositive motion, the transferor court typically will resolve the venue question without ruling on the dispositive motion, which is more properly resolved by the transferee court.").

draw inferences from those allegations in the light most favorable to the plaintiff." *Societe Des Hotels Meridien v. LaSalle Hotel Operating P'ship, L.P.*, 380 F.3d 126, 129–30 (2d Cir. 2004) (citation omitted). The complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citation omitted). "A claim has facial plausibility when the plaintiff pleads *factual content* that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (emphasis added). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* A conclusory assertion is a conclusion without "factual enhancement" to support the conclusion. *Id.* In other words, the complaint must offer more than an "unadorned, the-defendant-unlawfully-harmed-me accusation" to defeat dismissal. *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

The TVPA is "an Act to combat trafficking of persons, especially into the sex trade, slavery, and slavery-like conditions, in the United States and countries around the world through prevention, through prosecution and enforcement against traffickers, and through protection and assistance to victims of trafficking." H.R. Conf. Rep. 106–939, at 1 (2000). Its primary objective is to "combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims." *Id.* at 3. The Act imposes both criminal and civil liability to:

> (a) Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means--
>
> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
> (2) by means of serious harm or threats of serious harm to that person or another person;
> (3) by means of the abuse or threatened abuse of law or legal process; or
> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint[.]

18 U.S.C. § 1589.

Plaintiffs allege that "Western Express has knowingly recruited numerous persons for labor and has obtained and attempted to obtain the labor of Plaintiffs Martin, Neal, and McRoberts and other similarly situated drivers by means of threats of serious harm, by means of the abuse or threatened abuse of law or legal process, and/or by means of a scheme, plan, or pattern intended to cause persons to believe that, if they did not perform labor for the company, they would suffer serious harm." Doc. 1, ¶ 58. Plaintiffs, however, have not alleged facts that—even if true—would plausibly demonstrate that they have standing to pursue relief under the TVPA.

> **A.** *Plaintiffs have not alleged facts that could show that Western Express threatened them with "serious harm."*

The TVPA defines "serious harm" as "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2). As noted by the Ninth Circuit:

> To be sure, not all bad employer-employee relationships or even bad employer-immigrant nanny relationships will constitute forced labor. First, the threat of harm must be serious. Congress intended to address serious trafficking, or cases "where traffickers threaten harm to third persons, restrain their victims without physical violence or injury, or threaten dire consequences by means other than overt violence." H.R.Rep. No. 106–939, at 101, 2000 U.S.C.C.A.N. at 1392–93 (Conf.Rep.). According to the statute, the threat, considered from the vantage point of a reasonable person in the place of the victim, must be "sufficiently serious" to compel that person to remain. *See* 18 U.S.C. § 1589(c)(2).

*United States v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011).

Although Plaintiffs need not demonstrate that they were immigrants or that they were trafficked, they must show that any threat of harm rose to the level of being "serious." The only harm that Plaintiffs allege is financial harm. Specifically, they cite Western Express "requiring

drivers to 'buy-out' the contracts containing the noncompete to avoid Western Express enforcing the non-compete; threatening to place thousands of dollars in 'liquidated damages' with collections agencies if drivers do not 'buy-out' the contracts, thereby causing the driver to incur up to 25 percent in collection fees and negative credit marks on their credit reports." Doc. 1, ¶ 59. Yet the only "thousands of dollars" to which they allude, *id.*, is a liquidated damages provision requiring the repayment of $2,500, which Western Express estimates to be the reasonable value of the program. *Id.*, ¶ 56; Doc. 1-3, § 5.

Western Express located very few cases in which a non-immigrant brought suit under the TVPA. Most TVPA cases involve "withholding or threatening to withhold payment for work performed; threats of deportation, arrest, or imprisonment; intolerable working or living conditions; extreme isolation; threats of retaliation for an employee voicing criticism; threats to allow visas to expire without renewal; threats to terminate employment when employees ask for reimbursement for housing fees; extortion; systemic fraud; and confiscating and withholding passports, identity documents, or immigration documents." *Estavilla v. Goodman Group, LLC*, 2022 WL 539192, at *12 (D. Mont. Feb. 23, 2022); *see also Muchira v. Al-Rawaf*, 850 F.3d 605, 618–19 (4th Cir. 2017), *as amended* (Mar. 3, 2017) ("Typically, therefore, 'forced labor' situations involve circumstances such as squalid or otherwise intolerable living conditions, extreme isolation (from family and the outside world), threats of inflicting harm upon the victim or others (including threats of legal process such as arrest or deportation), and exploitation of the victim's lack of education and familiarity with the English language, all of which are "used to prevent [vulnerable] victims from leaving and to keep them bound to their captors.") (citing *United States v. Callahan*, 801 F.3d 606, 619 (6th Cir. 2015)).

Western Express is only aware of two other instances in which a trucking company has been accused of violating the Act—both of which were within the Sixth Circuit and one of which involved Western Express. In *Elmy v. Western Express, Inc.*, No. 3:17-cv-01199, 2020 WL 1820100, at *1 (M.D. Tenn. Apr. 10, 2020), the plaintiff was a Western Express independent contractor driver who also signed a truck lease. The plaintiff alleged that, under Western Express's contractual arrangement, "if a driver stops working for Western Express, does not make even a single lease payment, or in any way breaches any provision of the [agreements], the lease operator will be put in default, thereby imposing crushing debt on the driver since 'a lease for a new truck can cost a Plaintiff over $100,000.'" *Id.* at *7 (citation to record omitted).[6] The plaintiff alleged that the threat of this debt, coupled with Western Express "compromising the driver's ability to secure another job in the trucking industry," were sufficient to constitute threats of serious harm so as to invoke the TVPA. *Id.*

The district court found that "the foregoing facts alleged, taken as true, are sufficient to withstand a Rule 12(b)(6) challenge. *Id.* In reaching its conclusion, the court cited *Carter v. Paschall Truck Lines, Inc.*, 324 F. Supp. 3d 900 (W.D. Ky. 2023). There, the plaintiff truck drivers entered into both independent contractor agreements and lease-purchase agreements with the defendant. *Id.* at 903. The plaintiffs were only allowed to drive for the defendant and were subjected to more than $100,000 in liability if they defaulted under the lease agreements. *Id.* at 903-04. The court concluded that, by pleading that they could be subject to over $100,000 in liability, the plaintiffs sufficiently pled "serious harm" under the TVPA. *Id.* at 915-16.

A subsequent summary judgment ruling by the Kentucky federal court in that case is noteworthy. *See Carter v. Paschall Truck Lines, Inc.*, 2023 WL 359559, at *8 (W.D. Ky. Jan. 23,

---

[6] The proof later demonstrated that it was a walk-away lease and that the debt was mischaracterized in the complaint.

2023). At that point, the parties did not focus on the lease default obligation, but instead, a $5,000 liquidated damages provision in the parties' independent contractor agreement. *Id.* at *1. Therein, drivers agreed to pay a $5,000 "early termination fee" if they quit within nine months of execution. *Id.* The plaintiff, Carter, quit after working for two months. *Id.*

The court found that, to be actionable under the TVPA, the fee must have subjectively coerced Carter to continue working for the defendant and that it was objectively coercive. *Id.* at *9. Addressing the subjective component, the court found:

> Carter's decision to quit [defendant] and get a new job during his 9-month probationary period, rather than after the early-termination threat lapsed, is hard to square with his position that he felt compelled by the early-termination fee to keep working at [defendant]. . . . That Carter quit after only two months, willingly triggering the $5,000 fee rather than waiting all 9 months, strongly suggests that the threat of the fee did not coerce him into working for [defendant].

*Id.*

The court also concluded that, regardless, a reasonable person in Carter's position would not have felt coerced by the fee:

> Carter's evidence could not support a jury finding that a "reasonable person" in the "same circumstance" and of the "same background" as Carter would feel compelled to continue laboring in order to avoid triggering the $5,000 liquidated-damages clause. §§ 1589(a)(2) & (c)(2).

> Carter alleges no physical, mental, or other pressures were brought to bear—only economic pressure. And unlike the plaintiffs in more extreme TVPA cases, Carter does not purport to be a non-citizen. Nor does anything suggest he struggles with the English language, is unusually uneducated, or is of a vulnerable age. *See Muchira*, 850 F.3d at 620–21. Carter admits he reviewed the terms of the contract, knew about the $5,000 fee when he signed that contract, and voluntarily entered into the agreement with PTL.

*Id.* at *9-10. The court also noted that other cases in which a sum of around $5,000 was deemed a sufficiently severe threat were "dissimilar," because they involved other threats, such as deportation. *Id.* at *10.

Here, in sharp contrast to *Elmy*, Plaintiffs do not allege any facts that would plausibly support a finding that they were subject to a "crushing debt" by virtue of the $2,500 liquidated damages fee. *Elmy*, 2020 WL 1820100, at *7. They also do not allege facts that could show that, from an objective standpoint, an ordinary person in their circumstances would have felt forced to work for Western Express. They do not allege that they are immigrants, that they "struggle[] with the English language, [are] unusually uneducated, or [are] of a vulnerable age." *Carter*, 2023 WL 359559, at *10. Nor do they allege any facts about the financial impact on them.

In fact, as in *Carter,* Plaintiffs' own allegations refute the notion that they felt coerced to work for Western Express. McRoberts alleges that he immediately quit before he even started driving for Western Express. Doc. 1, ¶¶ 39-40. Martin formally resigned from Western Express merely *12 days* after signing his Employment Agreement, and Neal resigned less than two months after his employment began. *Id.*, ¶¶ 42, 48, 51. Moreover, none of the "harassing" communications they received from Western Express prompted them to reconsider. *See id.*, ¶¶ 49-50, 53-56. Plaintiffs cannot plausibly plead that a reasonable person would have felt compelled to continue working for Western Express given that *all three* of them left within a few weeks.

### B.    Plaintiffs have not alleged that any threat of harm was improper.

Even if Plaintiffs alleged facts that could plausibly show that the $2,500 liquidated damages provision was sufficiently coercive, their TVPA claim still is not viable because any threat of that debt was not improper. Courts have determined that a threat of financial harm (regardless of amount) may only qualify as "serious harm" if the threat is improper. As noted in *Carmen v. Health Carousel, LLC*, 2021 WL 2476882, at *6 (S.D. Ohio June 17, 2021):

> [T]here are all sorts of financial pressures that can arise in the employment setting, and not all of them serve to establish a TVPA violation. Start with the easy example—if a person leaves a job, the employer typically stops paying that person. That is a "financial harm" to the (now-former) employee in some sense. And it may well be that the threat of losing one's paycheck is "sufficiently serious" to "compel

a reasonable person" to keep working a job that she does not like. *See* 18 U.S.C. § 1589(c)(2). But no one would suggest—or at least no one should suggest—that an employer violates the TVPA simply by refusing to continue paying employees who have quit. Rather, to constitute "financial harm" under the TVPA, the threatened harm must be in some way ***improper or illicit***.

(Emphasis added).

In *Carter, supra*, the court also dismissed the plaintiff's TVPA claim on this basis. 2023 WL 359559, at *11. The court first noted that state law governs the inquiry:

> For "financial harm" to be sufficiently "serious," it "must be in some way improper or illicit." *Dale Carmen v. Health Carousel, LLC*, No. 1:20-cv-313, 2021 WL 2476882, at *6 (S.D. Ohio Jun. 17, 2021). This requires "distinguish[ing] between '[i]mproper threats or coercion and permissible warnings of adverse but legitimate consequences.'" *Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 1180 (9th Cir. 2012) (church's threat to declare plaintiffs "suppressive persons" if they were to quit working, potentially causing them to lose contact with family and friends, wasn't improper and therefore didn't constitute a threat of serious harm) (quoting *United States v. Bradley*, 390 F.3d 145, 151 (1st Cir. 2004), *judgment vacated on other grounds*, 545 U.S. 1101 (2005)). So whether a liquidated-damages clause constitutes serious financial harm depends in part on whether the clause would be valid under the relevant state law. *See, e.g., Paguirigan v. Prompt Nursing Emp. Agency LLC*, No. 17-cv-1302, 2019 WL 4647648, at *17 (E.D.N.Y. Sept. 23, 2019) (unlawful fee under New York law violated § 1589); *Panwar v. Access Therapies, Inc.*, No. 1:12-cv-619, 2015 WL 1396599, at *4 (S.D. Ind. Mar. 25, 2015) (lawful fee under Indiana law did not violate § 1589).

*Id.* at *8. Because the plaintiff "does not argue that the early-termination fee violated [applicable] Kentucky state law," and the facts would not support any such argument, the court found that the plaintiff could not meet his burden of demonstrating a violation of the TVPA. *Id.* at *11.

The Montana district court's ruling in *Estavilla v. Goodman Group, LLC*, 2022 WL 539192 (D. Mont. Feb. 23, 2022)*,* is also instructive. Granting the defendant's Rule 12 motion to dismiss, the court rejected the plaintiff former employee's argument that a $26,642.47 liquidated damages provision reflected in a promissory note qualified as "serious harm" and her argument that "this serious harm was further compounded by her at-will employment status, which allowed Defendants to terminate her employment at any time [and] still collect the [liquidated damages],

as well as the offer Letter's non-compete clause." *Id.* at *13.  After noting that "to constitute 'financial harm' within the meaning of the TVPA . . . the threatened harm must be in some way improper or illicit," *id.* (citing *Carmen*, 2021 WL 2476882, at *6), the court distinguished the case from instances in which a threat of financial harm was coupled with other allegations of coercion. *Id.* at *13-14.  The court noted that, although the parties' offer letter agreement contained non-compete restrictions and a provision about notifying immigration authorities, the plaintiff did not "allege that Defendants enforced or threaten to enforce those provisions against her." *Id.* at *14. Instead, her "allegations are based entirely on the contents of the Offer Letter and Promissory Note, which were held to be enforceable" in litigation that the defendant brought against the plaintiff. *Id.*  Not only did the plaintiff fail to allege that the contractual terms were unenforceable under state law, "the contractual provision was found enforceable[.]" *Id.* at *15.

The court relied on *Panwar v. Access Therapies, Inc.*, 2015 WL 1396599 (S.D. Ind. Mar. 25, 2015).  There the plaintiffs argued that they were coerced to work by threat of "serious harm" by virtue of a $20,000 promissory note and a threat to revoke their visas. *Id.* at *3.  Dismissing the plaintiffs' TVPA claim on summary judgment, the court found "[t]he claim that the liquidated damages provision and the promissory note constituted a threat of financial harm sufficient for a finding of liability under the TVPA is not supported by the evidence or the applicable legal principles." *Id.* at *3.  The court noted that "the fact [the plaintiffs] voluntarily entered into the employment contracts belies this characterization" of "forced labor" and that "[t]here is no evidence that [the plaintiffs] were coerced or deceived into signing the employment agreements." *Id.* at *3.

Here, as in those cases, Plaintiffs do not allege they were "coerced or deceived into signing the employment agreements," *id.*, and they do not allege that any "threatened harm" by Western

Express was "improper or illicit." *Carmen*, 2021 WL 2476882, at *6. In fact, Martin does not allege that Western Express made any threat at all. Martin alleges that he "receive[d] harassing text messages and calls from Napier and others trying to get him to return to Western Express," Doc. 1, ¶ 49, but he does not claim he was threatened. Although Martin also points to receiving a December 6, 2021, email, *id.*, ¶ 50, that email contains no threat; instead, it merely asks that he "[p]lease contact recruiting" and states that "I am confident that we will be able to reach a mutually agreeable solution in this matter." Doc. 1-4. Notably, Martin does not allege that he heard from Western Express in any form of fashion after receiving that email more than 1½ years ago.

Similarly, Neal merely alleges that he was told that "he would need to pay Western Express," and that he received an email on July 8, 2021, asking him to contact Western Express. Doc. 1, ¶¶ 51, 53, Doc. 1-5. He does not allege that Western Express took any other action since that communication more than two years ago. McRoberts alleges that Western Express turned his matter over to a collection agency but does not allege any further action after January 1, 2022—more than 1½ years ago. Doc. 1, ¶¶ 54-56.

None of the Plaintiffs alleges that Western Express pursued any legal action against them, whether to collect a debt, enforce a noncompete restriction, or anything else. Significantly, even if they did, none alleges that any attempt by Western Express to enforce its employment agreements would violate Tennessee law or any other state law. Without setting forth factual allegations that would plausibly show that the employment agreements are invalid under applicable state law, Plaintiffs have not met their burden of alleging that Western Express improperly or illicitly threatened them with harm.

### C. *Plaintiffs have not alleged any abuse of the legal process.*

Finally, Plaintiffs have not alleged facts that would show that Western Express has "abuse[d] or threatened abuse of law or legal process." 18 U.S.C. § 1589(a)(3). Congress has

defined those terms as "the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action." *Id.* § 1589(c)(1).

Plaintiffs have not alleged that Western Express undertook any legal process against them. Nor do they allege that Western Express threatened to take legal action. At most, McRoberts simply alleges that his matter was reported to a credit reporting agency and turned over to a collection agency. Doc. 1, ¶¶ 54-57. And that was only after Western Express asked McRoberts to contact its "contract department to explore various options," which he apparently chose not to do. *Id.*, ¶ 53.

Even if Western Express's action amounted to the use or threat of use of the legal process, Plaintiffs have not pled facts that would plausibly show that the legal process was "abuse[d]." 18 U.S.C. § 1589(a)(3). Again, Plaintiffs must plead facts to show that Western Express's "threats" had no viable basis under applicable state (Tennessee) law. Their Complaint makes no attempt to do so.

In *Panwar, supra*, the court noted that "Plaintiffs conflate the 'use' of legal process with the 'abuse' of legal process." 2015 WL 1396599, at *5. According to the court:

> [F]iling lawsuits against employees who breached their employment contracts is exactly the end that the legal process at issue was designed to accomplish. It is not an abuse of legal process to enforce valid contractual rights against individuals who no longer wish to be bound by the terms of an agreement they voluntarily signed. By Plaintiffs' logic, any pursuit of damages for breach of contract would constitute an abuse of process, which would be an absurd outcome.

*Id.*; *see also Estavilla*, 2022 WL 539192, at *15-16 (noting distinction between the "use" and "abuse" of the legal process and finding that, "[a]bsent some allegation by [Plaintiff] that she felt forced to continue working for [Defendants] because of the non-compete clause, or that

Defendants attempted to enforce the clause against her, the Court finds this allegation is not sufficient [to] establish 'abuse or threatened abuse of law or legal process'").

In sum, Plaintiffs have alleged only theoretical harm, and to the extent they have alleged any actual potential harm, it is *de minimus*—less than $3000. Even then, Plaintiffs do not allege any improper or illicit threats and certainly no threats that coerced them or would coerce anyone else in their position to work for Western Express. Indeed, just as all three Plaintiffs freely entered into their employment agreements with Western Express out of their own volition, all three freely resigned soon thereafter. If they did not like the terms of the contracts, they simply could have chosen not to sign them. Plaintiffs' suggestion that their relationship with Western Express was tantamount to modern day slavery is an affront to those the TVPA was designed to protect.

## V. Plaintiff Martin's CUTPA claim (Count II) should be dismissed for failure to state a claim for which relief may be granted.[7]

Under Conn. Gen. Stat. Ann. § 42-110b(a), "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." "To state a claim for a violation of CUTPA, a plaintiff must establish that '(1) the defendant was acting in trade or commerce; (2) that the defendant engaged in unfair or deceptive acts; and (3) that such unfair or deceptive acts caused the plaintiff to suffer an ascertainable loss.'" *Edwards v. McMillen Cap., LLC*, 574 F. Supp. 3d 52, 70 (D. Conn. 2021) (citing *Tanasi v. CitiMortgage, Inc.*, 257 F. Supp. 3d 232, 275 (D. Conn. 2017)). Further "a CUTPA claim must be pleaded with particularity to allow evaluation of the legal theory upon which the claim lies." *Connecticut v. Moody's Corp.*, 664 F. Supp. 2d 196, 201 (D. Conn. 2009); *see also In re Newman*, 588 B.R. 281, 310 (Bankr. D. Conn. 2018) (same); *S.M.S. Textile Mills, Inc. v. Brown, Jacobson, Tillinghast,*

---

[7] This Rule 12(b)(6) challenge should also be resolved by the Middle District of Tennessee unless this Court denies Western Express's request for transfer. *Marom*, 2020 WL 1862974, at *2.

*Lahan & King, P.C.,* 32 Conn. App. 786, 797, 631 A.2d 340, 346 (1993) (same); *Haven Skate Park, LLC v. G.J. Zurolo Real Est., LLC,* No. NNHCV13603537S, 2013 WL 6989496, at *4 (Conn. Super. Ct. Dec. 18, 2013) (same).

Martin has not pled facts that could plausibly establish *any* of these three elements, and therefore, his CUTPA claim should be dismissed.

### A.    *Martin's claim does not pertain to trade or commerce.*

Conn. Gen. Stat. § 42-110b(a) expressly states that a prohibited act or practice must be "in the conduct of any trade or commerce." CUTPA defines "trade or commerce" as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." Conn. Gen. Stat. Ann. § 42-110a. Plaintiffs' allegations against Western Express entail *none* of these, and instead clearly concerns employment related matters. As recognized by the Connecticut Supreme Court, CUTPA is not intended to include actions brought in the employer/employee context. *United Components, Inc. v. Wdowiak*, 239 Conn. 259, 264-65 (1996). Thus:

> It is well established law in Connecticut that "[T]he employer-employee relationship does not fall within the definition of trade or commerce for the purposes of an action under CUTPA ... [A]lthough an employer may engage employees for the purpose of promoting trade or commerce, the actual employment relationship is not itself trade or commerce for the purpose of CUTPA." (Footnote omitted; internal quotation marks omitted.) *Quimby v. Kimberly Clark Corp.,* 28 Conn. App. 660, 670, 613 A.2d 838 (1992), overruled on other grounds by *Hart v. Carruthers,* 77 Conn. App. 610, 823 A.2d 1284 (2003).

*Yu v. Pitney Bowes, Inc.*, No. FSTCV196039771S, 2019 WL 4060118, at *3 (Conn. Super. Ct. 2019); *see also Matysiak v. Spectrum Serv. Co.*, No. 3:10-cv-01841, 2014 WL 545412, at *3-5 (D. Conn. Feb. 10, 2014) (noting same and finding that "[t]he overall character of this matter, and of Defendants' alleged actions insofar as they impacted and damaged Plaintiff, is fundamentally

based on—and limited to—an employer-employee relationship"); *Muniz v. Kravis*, 59 Conn. App. 704, 711, 757 A.2d 1207, 1213 (2000) ("[A]n employment relationship does not constitute trade or commerce for purposes of CUTPA."); *Quimby v. Kimberly Clark Corp.*, 28 Conn. App. 660, 670, 613 A.3d 838 (1992) ("The relationship in this case is not between a consumer and a commercial vendor, but rather between an employer and an employee."); *Advanced Copy Techs., Inc. v. Wiegman*, No. CV156013794, 2016 WL 4071863, at *3 (Conn. Super. Ct. 2016) ("The employment relationship between an employer and an employee is not considered trade or commerce for the purpose of a CUTPA violation.").[8]

Nor are an employer's pre-employment or post-employment interactions considered "trade or commerce" subject to CUTPA. *Learning Care Group, Inc. v. Armetta*, No. 3:13-cv-01540 (VLB), 2014 WL 12651264, at *19 (D. Conn. Sept. 30, 2014) (CUTPA non-applicability "is true regardless of whether the employer's actions occurred before, during, or after the employee's term of employment."); *Shah v. Cover-It, Inc.*, No. CV990068182, 2000 WL 486945, at *1 (Conn. Super. Ct. Apr. 10, 2000) ("[A]ction by an employer either during the employer-employee relationship, or acts designed to create that relationship are outside CUTPA's purview.").

For instance, in *Cucuel v. Fayed*, No. CV94315420, 1997 WL 120007, at *1 (Conn. Super. Ct. Feb. 28, 1997), the plaintiff argued that he was deceptively induced to quit his job and accept employment with the defendants. Rejecting the plaintiff's argument that "the defendants' acts in soliciting his employment" were subject to CUTPA, the court concluded that "[t]he allegations

---

[8] This is consistent with the exception for regulated activities set forth in Conn. Gen. Stat. § 42-110c. *See Beyond Home Care Staffing Serv., LLC*, CV 156058438, 2016 WL 8115595, at *2 (Conn. Super. Ct. Oct. 24, 2016) ("Trade regulation statutes such as CUTPA are inapplicable to the employer-employee relationship because the employer-employee relationship 'already is extensively regulated.'") (citation omitted).

and the evidence do not reveal any trade or commerce being carried on except for the actual engagement of the plaintiff, creating an employer-employee relationship." *Id.* at *8.

Similarly, in *Kintner v. Nidec-Torin Corp.*, 662 F. Supp. 112 (D. Conn. 1987), the plaintiff alleged that the defendant fraudulently induced him to enter into an employment relationship in violation of CUTPA. The plaintiff attempted to distinguish his case from black-letter Connecticut law that CUTPA does not apply to the employer-employee relationship "by arguing that the fraudulent acts alleged in the complaint took place prior to the creation of the employer-employee relationship." *Id.* at 113. Rejecting the plaintiff's argument, the Court concluded that "[j]ust as actions by an employer during the existence of the employer-employee relationship do not fall within this definition [of 'trade or commerce'], neither do the acts alleged in this case, which were designed to create the employment relationship in the first place." *Id.*; *see also Parimal v. Manitex Int'l, Inc.*, No. 3:19-cv-10910, 2021 WL 1146918, at *1-2, 9 (D. Conn. Mar. 25, 2021) (finding that similar allegations relating to deceptive conduct in the plaintiff's recruitment "arise out of the employer-employee relationship," and thus, are not cognizable under CUTPA); *Jablonksi v. Sheldon Precision Co.*, No. CV980145784, 2000 WL 486930, at *1, 4 (Conn. Super. Ct. Apr. 10, 2000) (similar); *CAP Maintenance Solutions, LLC v. Wallingford Autopark, Inc.*, CV166060392S, 2016 WL 5798834, at *3 (Conn. Super. Ct. Sept. 6, 2016) ("[I]n reliance on *Quimby*, numerous Superior Court judges have stricken CUTPA claims when the allegations arise out of or are closely related to an employer-employee relationship."); *Stavridis v. Nat'l Spine and Pain Centers, LLC,* No. DBDCV19603492S, 2020 WL 3790729, at *2 (Conn. Super. Ct. June 15, 2020) ("The Supreme Court in *United Components* unequivocally directs this court to find that 'CUTPA [is] inapplicable to [the plaintiff's] claim because [her] claim involved an employer-employee relationship,' and the Appellate Court in *Quimby* provided the same unambiguous directive….").

Here, as in those cases, Martin's CUTPA claim relates to his employment relationship with Western Express and the creation of that relationship. Specifically, he alleges that "Western Express has engaged in similar unfair and deceptive practices as those experienced by Thomas Martin, namely: recruiting for company driver positions that individuals reasonably expect will be at-will positions as solo drivers; then, only after individuals have committed themselves to work for Western Express by attending Western Express's orientation for two to three days and by signing Western Express's new hire paperwork, informing them about the requirement to perform hundreds of hours of team driving as 'training.'" Doc. 1, ¶ 71. Recruiting and hiring drivers is not "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." Conn. Gen. Stat. Ann. § 42-110a. Nor does Western Express's imposition of its training requirement on its employee drivers fall with the statutory definition of "trade or commerce." *Id.*

### B.   *Martin's claim is also barred by the primary line of business doctrine.*

Even if Western Express's conduct at issue somehow qualified as "trade or commerce," Martin still would not have standing because the conduct is only tangentially related to Western Express's primary business of offering trucking services, and therefore, outside the scope of CUTPA for this independent reason.

As noted, Conn. Gen. Stat. § 42-110b(a) states that a prohibited act or practice must be "in the conduct of any trade or commerce." Construing subsection (a), the Connecticut Appellate Court has held that "a CUTPA violation may not be alleged for activities that are incidental to an entity's primary trade or commerce." *McCann Real Equities Series XXII, LLC v. David McDermott Chevrolet, Inc.,* 93 Conn. App. 486, 523, 890 A.2d 140, 164 (2006) (citing *Arawana Mills Co. v. United Technologies Corp.,* 795 F. Supp. 1238 (D. Conn. 1992)). In *McCann,* the

defendants, whose primary line of business was selling and servicing automobiles, sold the business premises to the plaintiff. *Id.* at 488. The plaintiff alleged CUTPA violations for the defendants' alleged misrepresentations and omissions related to environmental contamination of the property. The Appellate Court, however, held that "[b]ecause the defendants in this case were not in the business of selling real property, and the purchase and sale agreement at issue was merely incidental to the defendants' sale and serving of automobiles, we conclude that the court properly directed a verdict as to the plaintiffs' CUTPA count." *Id.* at 523.

The Appellate Court has reiterated this construction of CUTPA several additional times. *See, e.g., Sovereign Bank v Licata,* 116 Conn. App. 483, 494, 977 A.2d 229, 238 (2009) ("The defendant's allegation [in her counterclaim] solely related to an ancillary transaction that was incident to the [substituted plaintiff's] primary real estate business and thus fell outside the CUTPA penumbra."); *Biro v. Matz,* 132 Conn. App. 272, 290, 33 A.3d 742, 754 (2011) ("Because the sellers in the present case are not in the business of selling real property, CUTPA is inapplicable to the transaction in this case."); *Dinardo Seaside Tower, Ltd. v. Sikorsky Aircraft Corp.,* 153 Conn. App. 10, 23-26, 100 A.3d 413, 424-26 (2014) ("The plaintiff's primary argument is that the trial court … improperly interpreted CUTPA to limit the application of that statute to instances where the defendant's unfair or deceptive act occurred in the conduct of its primary trade or commerce. We are not persuaded by this argument.").

Simply put: "CUTPA claims cannot be alleged for activities that are incidental to an entity's primary business." *Beyond Home Care*, 2016 WL 8115595, at *1 (citing *Dinardo*, 153 Conn. App. at 26). Numerous Connecticut Superior Court decisions have held likewise in a variety of contexts. *See, e.g., Ruschmeyer v. Lydall, Inc.,* No. CV085002515S, 2009 WL 659359, at *1 (Conn. Super. Ct. Feb. 19, 2009) ("Violations of CUTPA are limited to transgressions

pertaining to a company's main commercial endeavor."); *SNET Info. Servs., Inc. v. Russell,* No. CV074024916S, 2009 WL 2035248, at \*3 (Conn. Super. Ct. June. 11, 2009) (dismissing claim relating to wrongful litigation-related conduct and finding that "this conduct of litigation cannot be the basis for a CUTPA violation because the defendant's allegations indicate that the plaintiff was engaged in unrelated trade or commerce of advertising"); *Buying Triangle, LLC v. Hartford Fire Ins. Co.,* No. CV106015469S, 2011 WL 3483469, at \*4-5 (Conn. Super. Ct. July 7, 2011) (dismissing claim on the basis that breach of contract related to achieving savings on purchase of office supplies was not part of primary line of defendant's business, which was insurance and financial services); *Columbia Dental, P.C. v. Dombkowski*, No. HHDCV155038642, 2017 WL 1015438, at \*7 (Conn. Super. Ct. Feb. 14, 2017) ("[I]n order to prevail, the plaintiff must still alleged and prove untoward behavior which arises from the defendant's primary trade or business…"); *Sechler-Hoar v. Trust U/W of Gladys G. Hoart*, No. 3:17-cv-01968 (KAD), 2020 WL 292314, at \*9–10 (D. Conn. Jan. 21, 2020) (dismissing CUTPA claim where activity in question did not satisfy the "primary business test"); *Butler Am., LLC v. Ciocca*, No. X08FSTCV196043745S, 2020 WL 6781488, at \*4 (Conn. Super. Ct. Mar. 12, 2020) (activity at issue was "ancillary to the defendant's primary trade, and cannot support a CUTPA claim").

The Complaint here clearly indicates that Western Express is a trucking company (*i.e.*, a commercial carrier), not a staffing company. *See* Doc. 1, ¶¶ 21, 27. Recruitment and hiring, conducting orientation and training, and/or enforcing employment agreements (*see id.* ¶¶ 71, 73) are each and all merely incidental to its primary business. For this independent reason, the Court should follow the same approach consistently taken by Connecticut courts as set forth above and find that Martin's claims do not fall within CUTPA's purview.

### C.    Martin has not alleged any unfair or deceptive acts.

Even if Martin had standing to pursue a CUTPA claim, he has not pled facts that would plausibly show that Western Express engaged in any "unfair or deceptive acts" within the meaning of Conn. Gen. Stat. Ann. § 42-110b(a).  Again, Martin alleges the following practice to be unfair and deceptive: "recruiting for company driver positions that individuals reasonably expect will be at-will positions as solo drivers; then, only after individuals have committed themselves to work for Western Express by attending Western Express's orientation for two to three days and by signing Western Express's new hire paperwork, informing them about the requirement to perform hundreds of hours of team driving as 'training.'"  Doc. 1, ¶ 71.

First, Martin pleads no basis for which it could be reasonably expected that a motor carrier—faced with regulatory and other obligations to mitigate significant safety risks to the general public—would immediately entrust a brand-new driver to operate a large semi-trailer truck with no supervision.  Nor does Martin plead that Western Express assured him from the outset that he would immediately be a solo driver.

Further, Martin's claim that Western Express only informed him *after* he signed his new hire paperwork that he would be expected to undergo training cannot be reconciled with the documents that he, himself, filed with the Complaint.  Indeed, Martin's own Employment Agreement, which he chose to sign, explicitly details those training obligations.  *See* Doc. 1-3 §§ 1.C, 2.A.  If Martin did not want to be bound by the training requirements or the restrictions set forth in the Employment Agreement, all he had to do was decline to sign the agreement and decline to be employed by Western Express.  Instead, he chose to accept Western Express's offer of hire.

**D.** *Martin has not pled that he has sustained any damages.*

Martin's CUTPA claim should also be dismissed because he has not pled facts that would plausibly show that he has sustained an "ascertainable loss." *Edwards*, 574 F. Supp. 3d at 70. As noted by the Connecticut Supreme Court:

> The ascertainable loss requirement is a threshold barrier which limits the class of persons who may bring a CUTPA action seeking either actual damages or equitable relief.... Thus, to be entitled to any relief under CUTPA, a plaintiff must first prove that he has suffered an ascertainable loss due to a CUTPA violation." (Citation omitted; internal quotation marks omitted.) *Collins v. Anthem Health Plans, Inc.,* supra, 275 Conn. at 334, 880 A.2d 106.
>
> An "ascertainable loss" is a loss that is "capable of being discovered, observed or established." (Internal quotation marks omitted.) *Hinchliffe v. American Motors Corp.,* 184 Conn. 607, 613, 440 A.2d 810 (1981). "The term 'loss' necessarily encompasses a broader meaning than the term 'damage,' " and "has been held synonymous with deprivation, detriment and injury." *Id.* To establish an ascertainable loss, a plaintiff is "not required to prove actual damages of a specific dollar amount." *Id.* "[A] loss is ascertainable if it is measurable even though the precise amount of the loss is not known." *Id*., at 614, 440 A.2d 810.
>
>  !

*Artie's Auto Body, Inc. v. Hartford Fire Ins. Co.,* 287 Conn. 208, 217–18, 947 A.2d 320, 329–30 (2008).

Martin's only attempt to plead any ascertainable loss consists of the following bare allegations:

> 73.   Western Express's actions have caused an ascertainable loss of money or property to drivers by: (a) causing individuals to forego other job opportunities with less onerous conditions of employment; (b) causing individuals to incur thousands of dollars of debt for Western Express "training," which they would not have incurred as at-will company drivers; and (c) inhibiting individuals from seeking and obtaining work with other motor carriers due to the threat of Western Express attempting to enforce the non-compete agreement.
>
> 74.   For example, Thomas Martin is now burdened by a debt of $2,500 to Western Express that he must pay in order to "buy out" his employment contract.

Doc. 1.

Although Martin purports to be subject to an alleged $2,500 debt, he does not articulate how this is imposing any burden on him whatsoever. To the contrary, he alleges that the last communication he had with Western Express about the "debt" or otherwise took place on December 6, *2021*. *Id.*, ¶ 50. In an innocuous email on that date, Western Express merely stated:

> We've been attempting to reach you regarding the termination of your employment with Western Express, Inc. and your defaulted Employment Agreement. You agreed to be employed by Western Express, Inc. for a period of 6 months, beginning on the effective date of the Agreement, or pay up to $2,500 as outlined in the Employment Agreement. To date, you have not complied with either of these options.
>
> Please contact recruiting at (888)219-2093 to discuss returning to work or me at (615)846-6976 to exercise your right to buyout your employment agreement by **December 13, 2021**.
>
> We look forward to your prompt response. I am confident that we will be able to reach a mutually agreeable solution in this matter.

Doc. 1-4 (emphasis in original). Martin does not allege that Western Express has taken any actions subsequent to that email to collect any "debt" or that he has sustained any actual loss of money or property.

Even if "foregoing other job opportunities" or being inhibited from "seeking and obtaining work with other motor carriers" (Doc. 1, ¶ 73) could rise to the level of an ascertainable loss, Martin does not plead any facts with any specificity whatsoever that would plausibly demonstrate that *he* was in any way impacted by Western Express's actions. Nor does Martin articulate how he was harmed by being subjected to training. Martin does not (and cannot) allege that he was not paid during the training period. Nor does he allege how being asked to partake in temporary "team-driving" inflicted any harm on him whatsoever.

Martin's conclusory allegations of harm far fall short of the specificity required by *Twombly/Iqbal*, much less the "particularity" required by CUTPA. *Moody's Corp.*, 664 F. Supp. 2d at 201. For all of these reasons, Martin's CUTPA claim should be dismissed.

### E. *Martin may not pursue a nationwide class action CUTPA claim.*

Finally, even if Martin could otherwise allege a viable CUTPA claim, he nonetheless cannot invoke Conn. Gen. Stat. § 42-110g(b) so as to pursue or maintain a nationwide class claim. Conn. Gen. Stat. § 42-110g(b) states: "Persons entitled to bring an action under subsection (a) of this section may, pursuant to rules established by the judges of the Superior Court, bring a class action on behalf of themselves and other persons similarly situated *who are residents of this state or injured in this state to recover damages*." (Emphasis added). Subsection (b)'s restriction of nationwide class actions "reflects a substantive policy judgment by the Connecticut legislature," and "[b]ecause the restriction is substantive rather than procedural, Rule 23 [of the Federal Rules of Civil Procedure] cannot supersede it." *In Re Trilegiant Corp., Inc.,* 11 F. Supp. 3d 82, 118-19 (D. Conn. 2014) (striking nationwide class allegations under Fed. R. Civ. P. 12(f)); *see also Fraiser v. Stanley Black & Decker, Inc.,* 109 F. Supp. 3d 498, 506 (D. Conn. 2015) (same); *Metro Enter. Corp. v. United Techs. Int'l Corp.,* No. 3:03-cv-1685, 2004 WL 1497545 (D. Conn. June 28, 2004) ("[A] foreign person suffering ascertainable loss outside of Connecticut from unlawful conduct occurring inside the state may initiate an individual action in Connecticut, but may not bring a class action because such plaintiff could not be representative of class members with the statutorily required in-state residency or injury characteristics.").

Martin, who alleges to be "an adult resident of Bristol County, Massachusetts" (Doc. 1, ¶ 14), cannot act on behalf of non-residents or those not injured in Connecticut, as he purports to do in his Complaint. *See* Doc. 1, ¶¶ 19 and 85-91. Accordingly, Paragraphs 19 and 85-91 of the Complaint should be stricken under Rule 12(f).

## CONCLUSION

For the foregoing reasons, the Court should transfer Martin's claims to the Middle District of Tennessee and dismiss Neal and McRoberts' claims. Upon transfer, Martin's claims should be dismissed for failure to state a claim for which relief may be granted, and alternatively Paragraphs 19 and 85-91 of the Complaint should be stricken.

Respectfully submitted,

/s/ Daniel A. Schwartz
Sarah A. Westby
Daniel A. Schwartz
SHIPMAN & GOODWIN LLP
One Constitution Plaza
Hartford, CT 06103
Telephone: (860) 251-5503
Fax: (860) 251-5216
swestby@goodwin.com

David L. Johnson (admitted *pro hac vice*)
BUTLER SNOW LLP
The Pinnacle at Symphony Place
150 3rd Avenue South, Suite 1600
Nashville, TN 37201
Telephone: (615) 651-6700
Fax: (615) 651-6701
David.johnson@butlersnow.com

*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that, on September 19, 2023, a copy of the foregoing was filed electronically via operation of the Court's CM/ECF Electronic Filing System. A Notice of Electronic Filing will be sent by e-mail to all parties via operation of the Court's CM/ECF Electronic Filing System or by mail to anyone unable to accept electronic filing as indicated on the Notice. Parties may access this filing through the Court's CM/ECF System.

*/s/ Daniel A. Schwartz*
Daniel A. Schwartz